## COMMONWEALTH vs. FRANCESCO CAMPITI.

No. 91-P-1037.

Hampden. June 13, 1994. - August 7, 1996.

Present: ARMSTRONG, SMITH, & LAURENCE, JJ.

*Controlled Substances. Practice, Criminal,* Required finding, Grand jury proceedings, Indictment, Amendment of indictment or complaint, New trial, Motion to suppress, Continuance, Assistance of counsel, Conduct of government agents, Instructions to jury, Reasonable doubt, Warrant, Sentence. *Grand Jury. Probable Cause. Electronic Surveillance.*

Evidence at the trial of indictments for trafficking in cocaine was sufficient to warrant the judge's denial of the defendant's motion for required findings of not guilty. [44-47]

A criminal defendant's claim that the grand jury that indicted him was unlawfully extended and without authority to sit at the time it indicted him was without merit. [47-48]

At the trial of indictments there was no error in the judge's allowing the Commonwealth's motion to amend three of the indictments to allege the crimes were committed "on or before" a certain date. [48-51]

The judge at a criminal proceeding, who had heard and decided motions to suppress evidence seized pursuant to a search warrant filed by codefendants in the case before the defendant was arraigned, did not abuse his discretion in declining to conduct another hearing on an identical motion to suppress filed by the defendant, based on the same ground, as to which the defendant did not propose to offer new or additional evidence beyond what had been presented in the previous hearing. [56-57]

The record of a criminal proceeding did not support the defendant's contention that his trial counsel did not have time to prepare adequately for pretrial motions. [57-58]

A criminal defendant did not demonstrate that he received ineffective assistance of counsel by reason of counsel's alleged inadequate preparation for trial. [58-59]

The record of criminal proceedings did not support the defendant's claims that the trial judge did not consider the issue of whether probable cause supported the issuance of a search warrant and that the defendant's trial counsel rendered ineffective assistance in failing to raise the issue for consideration. [59-61]

There was no merit to the claims of a criminal defendant that various extensions of a wiretap warrant or new warrants issued after a certain date were not supported by probable cause. [61-62]

The judge at a criminal trial correctly concluded that the defendant's show-
ing of police misconduct, in making allegedly false misstatements in af-
fidavits for search warrants or in one investigating police officer's illegal
acts separate from the matters for which the defendant was indicted,
was too insubstantial to warrant an evidentiary hearing on a motion for
new trial. [62-66]

At a criminal trial, there was no error in the judge's instructions to the jury
on reasonable doubt. [67]

There was no error in the admission in evidence at a criminal trial of pen
register tapes and the transcripts of intercepted telephone calls and no
reasonable inference could be drawn that the pen register machines were
unreliable. [67]

There was no basis in the record on appeal from criminal convictions to
consider the defendant's argument that a search warrant had not
properly been returned [67-68], nor did the defendant demonstrate that
the Commonwealth otherwise failed to comply with the provisions of
the electronic interception statute in seeking a warrant or in providing
certain records to the defendant before trial. [68-69]

There was no basis in the record on appeal from criminal convictions to
support the defendant's contention that certain electronic intercepts
exceeded the scope of the warrant that authorized them. [69]

There was no merit to a criminal defendant's contention that his trial
counsel was ineffective for lack of preparation or in arguing on sentenc-
ing. [69-72]

INDICTMENTS found and returned in the Superior Court
Department on January 30, 1987.

The cases were tried before *William W. Simons*, J., and
postconviction motions were heard by him.

*Vincent A. Bongiorni* for the defendant.

*Ellen Berger*, Assistant District Attorney, for the Com-
monwealth.

ARMSTRONG, J. The defendant, alleged to be one of the
leaders of a drug importing and distribution business operat-
ing in the Springfield-Hartford area, appeals from convictions
on five indictments for trafficking in cocaine in amounts
exceeding 200 grams. He was sentenced to five terms of from
ten to fifteen years in State prison, four consecutive and one
concurrent. Although the convictions were in 1989, changes
of counsel and proceedings on a motion for a new trial and
other postconviction motions (he appeals also from their
denial) delayed final assembly of the record until June, 1993.
Extensive briefing delayed arguments for another year.

## MOTION FOR A REQUIRED FINDING

We outline the facts, by which we mean the evidence most

favorable to the Commonwealth, in connection with the defendant's motion for a required finding of not guilty on all of the indictments.

The Commonwealth's evidence tended to show that the defendant was a major importer and distributor of cocaine in western Massachusetts and Connecticut. Based in Springfield, he would purchase cocaine by the kilogram, or multiple kilograms (kilos), in Florida from Joseph Fafone,[1] transport it to the Springfield-Hartford area, and distribute it through several intermediaries, including Joseph Rego, Joseph Labriola, and Gary Westerman, who in turn sold cocaine to pushers.[2] Two of the intermediaries, Rego and Labriola, testified as prosecution witnesses, and, on the basis of their testimony alone, the Commonwealth satisfied its burden. Rego testified that in June of 1986, he traveled with the defendant and Westerman to the Marina Bay Motel in Fort Lauderdale, Florida, where the defendant purchased one kilo of cocaine. He gave the kilo to Westerman, instructed Westerman to return to Massachusetts, distribute it, and return to the motel as soon as possible with the proceeds. Westerman did so, returning three or four days later. He gave the proceeds to the defendant, who drove to Boca Raton (Fafone's home) and returned with two kilos of cocaine. Westerman and Rego each concealed a kilo, broken down into one-ounce packets, in their clothing, and the three flew back to Bradley Field (in Connecticut) together. Rego transferred his kilo to the defendant in the airport, and Westerman's girlfriend then drove the defendant and Westerman (who lived in Westfield) home.

Rego testified to a second occasion in September, 1986, when he and the defendant flew down to Fort Lauderdale. Rego, joined by his wife, stayed at the Marina Bay Motel. The defendant stayed at a "luxury condominium" on the "G[alt] Ocean Mile." The defendant purchased one kilo of cocaine and brought it to the Marina Bay Motel, where, again, it was concealed in Rego's clothing. They flew back together to Bradley Field, drove to Williams Street in Springfield, where the defendant kept a safe house, and divided the kilo into packets for sale. The defendant had the key to the Williams Street house.

In October, 1986, Rego drove to Fort Lauderdale with his

[1]See *Commonwealth* v. *Fafone,* 416 Mass. 329 (1993).
[2]See *Commonwealth* v. *Westerman,* 414 Mass. 688 (1993).

wife and her daughter, and checked into the Sealord Motel. The three took a sidetrip by plane to Orlando, going to Disney World, then flew back to the Sealord Motel. There they met the defendant. Rego drove with the defendant to Fafone's condominium in Boca Raton, where the defendant obtained one kilogram of cocaine. This was placed under the back seat of Rego's rental car, and Rego, his wife, and her daughter drove back to Massachusetts. On the defendant's return to Massachusetts, Rego delivered the kilo to the defendant in a parking lot near a rotary in Agawam.

Joseph Labriola's testimony furnished a basis for three additional instances wherein the defendant possessed cocaine in kilo quantities in Massachusetts. In one instance Labriola accompanied the defendant to Florida to purchase kilos from Fafone. Characteristically, the defendant had Labriola physically transport the purchase — two kilos — back to New England. Labriola took it to a Rocky Hill, Connecticut, stash house. There he and the owner of the house, DiPietro, at the defendant's direction, cut one of the kilograms and distributed it in that area. Labriola transferred the other kilo to the defendant's nephew at an inn on the Connecticut-Massachusetts border for delivery to the defendant. On another occasion the defendant had Labriola come to a stash house on Williams Street in Springfield to assist him in cutting a kilo into retail quantities.

On November 17, 1986, the day the police executed search warrants simultaneously at the defendant's house in Agawam, Westerman's house in Westfield, and the stash house on Williams Street in Springfield, one of the defendant's associates, Sonny Pepe, was able to smuggle a kilo out of the Williams Street stash house (according to what the defendant later told Labriola) just ahead of the officers' entry. Four hundred twelve grams of cocaine were recovered by the police from Westerman's house. This quantity also, because in excess of two hundred grams, satisfied the terms of the indictments, so long as the jury found, as they could on the evidence, that the cocaine, although at Westerman's house, was possessed by the defendant through Westerman as his agent; for possession can be shown through evidence not only of actual, in-hand, exclusive possession, but, "in the case of constructive possession, knowledge coupled with the ability and intention to exercise dominion and control." *Commonwealth* v. *Rosa,* 17

Mass. App. Ct. 495, 498 (1984), quoting from *Commonwealth* v. *Deagle,* 10 Mass. App. Ct. 563, 567 (1980). The testimony of Rego and Labriola established that the defendant made it a point to have the cocaine he purchased from Fafone in Florida transported to New England as much as possible in the actual possession of his agents, who did with it what he directed after they arrived. This tactic reduced his own risk of detection, but it could not lessen his criminal responsibility for possession because of the principal-agent relationship between him and those in actual possession of the drugs.[3]

In the evidence described so far, without more, the judge had ample reason to deny the motion for required findings on any or all the indictments.[4]

## MATTER RELATING TO INDICTMENTS

The defendant argues that the grand jury which, on Janu-

---

[3]It is convenient to mention at this point two additional contentions the defendant makes without much enthusiasm in his brief: first, that the judge erred in failing to instruct the jury on the lesser included offense of simple distribution of cocaine (i.e., without the quantification necessary for trafficking); and, second, that the judge erred in omitting to charge the jury on joint venture as a basis of criminal responsibility. As to the first, it is true that numerous instances surfaced in the evidence regarding the defendant's and his minions' handling of quantities of cocaine less than two hundred grams, mainly in connection with the ongoing retail sales of the cocaine cut from the kilos (a sale of two ounces by Rego to State Trooper Holmes is an example); but it was only on the kilos, or other larger quantities, that the defendant was charged in the indictments that were tried; and the judge instructed the jury that, as to any of the indictments, a guilty verdict could only be returned if the amount involved was 200 grams or more. There was no need to charge with respect to smaller quantities, because the Commonwealth neither charged the defendant with, nor relied on, the lesser quantities except to show, as a foundation, the nature of the defendant's business. As to the judge's refusal to charge on joint venture, this omission, by its nature, could only benefit the defendant by foreclosing from the jury's consideration a possible additional theory of guilt. The Commonwealth's proof tended to show that Westerman, Rego, Labriola and the others were not partners, but rather that they were agents working for the defendant; therefore it was proper for the judge to charge (as he did) only on the principles of constructive possession.

[4]In addition to the Rego and Labriola evidence and the cocaine seized at Westerman's house on November 17, there was evidence in the form of a tape recording of the defendant himself, speaking in his car, stating to Rego that he had given out "nine" the previous day, and the jury, on the basis of other evidence, could properly have drawn an inference that "nine" referred to nine ounces of cocaine, or 252 grams.

ary 30, 1987, returned the indictments on which the defendant was ultimately convicted (this is the "first" grand jury referred to in *Commonwealth* v. *Westerman*, 414 Mass. at 703) was unlawfully extended, and thus was without lawful authority to sit, after October 3, 1986. (Hence, the defendant argues, the indictments were invalid, and the motion to dismiss them should have been allowed.) The grand jury began sitting in July, 1986, and, by reason of G. L. c. 277, § 2C (establishing the term of the Hampden County grand jury at four months), was scheduled to expire October 3. A grand jury may be extended, however, on written motion by the district attorney, upon approval by the court. G. L. c. 277, § 1A, inserted by St. 1952, c. 494. The problem in this case is that the written notice, or motion, by the district attorney is date-stamped October 24, 1986.

We assume, as the parties do, that a motion for extension must be filed during the life of the grand jury.[5] It appears, however, from the affidavits of the assistant district attorney and the assistant clerk assigned to the session that a written motion was before the judge on September 30, 1986, and, as appears from the stenographer's notes that day, that the judge orally allowed an extension, specifically contemplating that the grand jury would hear additional evidence on October 23 and 24 and would then complete its business. On October 24, however, upon noticing that there was no signed order reflecting that extension, another motion was presented to the judge seeking extension for the sole purpose of "complet[ing] an investigation now in progress," and a separate order was prepared and entered extending the life of the grand jury until it should complete that investigation. Whether this be regarded as the correction of a clerical error (i.e., the failure to docket the extension order on October 3) or as a second extension within the life of the grand jury (as extended by the judge's allowance of the undocketed written motion of September 30), it is clear that, on these facts, the grand jury did not expire prior to its return of the indictments on January 30, 1987.

The defendant argues that the indictments returned by the

---

[5]The assumption is presumably based on the usual meaning of "extend" (as contrasted with "renew") and on the fact that § 1A authorizes an extension "to complete an investigation then in progress." See *In re Grand Juries*, 764 F. Supp. 692, 693-694 (D. Mass. 1991).

grand jury were for instances of trafficking in cocaine differ-
ent from the instances upon which the defendant was found
guilty by the jury. The contention arises out of the welter of
cocaine trafficking and distribution evidence considered by
the grand jury. On January 30 the grand jury handed down
numerous indictments against Campiti, which, by the time of
trial in early 1989, had been reduced to five in number on
which the Commonwealth elected to proceed. All of these
indictments as well as some of those that were dismissed read
identically, except for the date assigned to the offense; that is
to say, each indictment was for trafficking in cocaine in an
amount of 200 grams or more, and the five dates assigned
were "on or about" the first (87-310), fourth (87-311), and
eighth (87-312) of November, 1986, and "on or before" the
seventeenth of the same month (87-326 and 87-329).[6]

On February 23, 1989, at the start of the trial (following
selection of the jury the previous day), the Commonwealth
filed a motion to amend the three indictments (87-310, 311,
312) that named dates other than November 17 (that being
the date of the simultaneous executions of the search war-
rants) to put all the indictments in the form of "on or before
November 17, 1987." The defendant objected to the amend-
ments, arguing that the effect would be to make the indict-
ments less specific as to time and thus lessen the Com-
monwealth's burden. The prosecutor argued that the
defendant was not prejudiced because he had already been
given two bills of particulars identifying with more precision
the evidence on which the Commonwealth would rely to
prove the different indictments. The judge allowed the mo-
tion.

There was no error. It is familiar law that an indictment

[6]The other indictments, those on which the defendant was not tried,
were 87-313 (trafficking in twenty-eight grams or more of cocaine "on or
about" September 24, 1986); 87-314 (trafficking, 200 grams or more, "on or
about" October 17, 1986); 87-315, 316, 317, 318, 319, 320, 321, 322, 323,
and 324 (all for distribution of cocaine "on or before November 17, 1986");
87-327 and 328 (all for trafficking in 200 grams or more of cocaine "on or
before" November 17, 1986); 87-332, 333, 334, 335, 336, and 337 (all for
conspiracy with different, named individuals to traffic in cocaine in varying
amounts "on or before" October 17, 1986); and so on, in the same vein,
through 87-357. These indictments and two others (325 and 331), both for
conspiracy, were all pending during the trial and were dismissed at the
request of the Commonwealth about two and one-half years later.

may be amended in immaterial detail or form but not in substance. *Commonwealth* v. *Snow*, 269 Mass. 598, 606-608 (1930). See Smith, Criminal Practice and Procedure § 741 (2d ed. 1983). The time alleged for an offense is ordinarily treated as matter of detail rather than substance (see G. L. c. 277, § 20; *Commonwealth* v. *Benjamin*, 358 Mass. 672, 678 [1971]), with the result that there will be no fatal variance if the Commonwealth has alleged one time for the commission of an offense and proves that it occurred, but at another time. See G. L. c. 277, §§ 34, 35; *Commonwealth* v. *Smith*, 368 Mass. 126, 129 (1975); *Commonwealth* v. *Kope*, 30 Mass. App. Ct. 944, 945 (1991).

It is theoretically possible, however, to have a situation in which the time of commission is all that differentiates between two crimes, as, for example, if a defendant is alleged to have robbed the same victim twice in successive weeks. In such a case, if the grand jury, having heard evidence of both crimes, indicts the defendant for the first robbery but not the second, the Commonwealth could not convict the defendant on proof that he committed the second robbery, see *Commonwealth* v. *Snow*, 269 Mass. at 609-610, and an amendment of the indictment to allege the date of the second robbery would accordingly be held substantial, and hence error.

In effect, the defendant alleges, this is what occurred when the dates of three of the indictments were amended in this case. In his brief, the defendant argues that the five indictments on which he was tried related to importations of cocaine in which he was assisted by Joseph Rego, that none of the indictments referred to cocaine imported through Joseph Labriola, and that the changes in the dates of the three indictments enabled the Commonwealth to convict Campiti based on evidence of transactions involving Labriola. Indeed, Campiti argues, the prosecutor in his closing argument "drop[ped] all of the three Rego indictments and [created], out of new trial material, several new Labriola indictments."

The difficulty with this argument, and the variation offered by counsel who argued Campiti's appeal,[7] is that they are not borne out by the record. The grand jury heard evidence of at

---

[7]Campiti's appellate counsel was ill at the time of argument, and Mr. Vincent Bongiorni, who had represented Westerman at his trial and was thus familiar with much of the underlying evidence, argued the appeal for

least one kilo-size importation by Campiti through Labriola, and the trial jury heard ample evidence of kilo-size importations involving Rego. The prosecutor at no point abandoned the Rego transactions. Campiti's contention to that effect is a distortion of the prosecutor's closing argument, in which he reasoned that, even if the jury were to disregard those of the Rego transactions that were tied into the relevant time period only by Rego's faulty memory (as contrasted with the Rego transactions for which there was corroborating evidence of time), they still had enough evidence before them to convict on some or all of the five indictments. We note as well that the defense was not caught by surprise when Labriola testified to obtaining Florida cocaine and bringing it to Massachusetts on Campiti's direction, or to the presence of kilo-size volumes of cocaine on two occasions at the Williams Street stash house. Labriola's testimony was forecast in bills of particulars prepared by the prosecutor. Moreover, two of what Campiti calls the "Labriola indictments" concerned possession of kilo-size amounts at the Williams Street stash. These are not necessarily different kilos from those imported through Rego; the source of that cocaine is not disclosed by evidence before either jury.

the defendant. He attempted to identify particular indictments with testimony before the grand jury in a manner that attributed all of the indictments to the Rego transactions, the Westerman cache, and the kilo Sonny Pepe removed from the Williams Street stash just ahead of the police raid on November 17. The effort to link particular indictments with particular testimony before the grand jury, while ingenious, turns out on examination of the testimony to be unduly speculative; that is to say, we see no way confidently to rule out the possibility that one or more of the indictments might have been based on the evidence concerning transactions with Labriola. (The preamendment dates on the three amended indictments coincided with days on which Campiti was observed by State police getting off flights from Florida, but there was no necessary connection between those particular flights and the Florida purchases to which Rego testified.) Moreover, Labriola's testimony concerning Pepe's removal of the kilo, or the cutting and packaging of a kilo at the Williams Street stash house, like the defendant's own tape-recorded statement concerning disposing of nine ounces (see note 4, supra), all would be admissible to show Campiti's possession of large amounts (200 grams or more) of cocaine, thus tending to corroborate the testimony of Rego (four instances) and Labriola (at least one instance) concerning their importing kilo-size amounts at Campiti's direction.

## THE NEW TRIAL MOTION

Campiti was sentenced on March 6, 1989. On August 2, 1991, with the record still unassembled, new counsel appeared to represent Campiti for purposes of the appeal. The record was assembled shortly thereafter on August 30, 1991. On April 4, 1992, the defense filed a motion for a new trial, together with ancillary motions for discovery, for Commonwealth payment of an expert witness with experience in electronic surveillance, and for an evidentiary hearing on all of these motions. Appellate proceedings on the appeal from the conviction which was then pending in the Appeals Court were stayed pending decision on the new trial motion. After a delay caused in part by the illness of the trial judge, the several motions, now augmented by the filing of a supplemental motion for a new trial, with a supplemental affidavit and memorandum of law, were heard before the trial judge on November 6, 1992. This was a nonevidentiary hearing, the primary focus of which was on the question whether the grounds for the original and supplemental new trial motions were such as to warrant the defense's requests for discovery, an expert witness, and an evidentiary hearing.

On April 5, 1993, the trial judge entered a memorandum of decision denying the motion for a new trial and, implicitly, the ancillary motions. Campiti appealed from the order, and a new record was assembled in June, 1993. The direct appeal and the appeal from the denial of a new trial were heard together. Most of the issues that Campiti argues in his briefs concern the denial of the new trial motion and the supporting motions. To understand these issues and the basis for the judge's denial of the new trial, it is necessary to recount in some detail events that preceded the defendant's trial in February, 1989.

In 1985 and early 1986, the district attorney's office in Hampden County was investigating loansharking activities involving Campiti and one Frank Pugliano, reputed to be a leader of organized crime in Western Massachusetts. A judge of the Superior Court had authorized the installation of pen registers on various phones, but these installations were later ruled illegal, and the information that was gathered was suppressed. See *Commonwealth* v. *Westerman*, 414 Mass. at 690. In April, 1986, loansharking indictments were returned, and Campiti was arraigned on those charges. During the summer

months the district attorney's investigation continued with an eye to bringing other loansharking and extortion charges. In August, the original loansharking charges were continued to December 2, 1986, for a conference and the setting of a trial date. In September, State Trooper Peter Higgins made application for a pen register and trap and trace unit to be installed on Campiti's phone at his Agawam residence, and for a wiretap[8] of a West Springfield travel agency, Travel Majic,[9] supported by an affidavit concerning Campiti's and Pugliano's suspected loansharking activities. Based on accumulating evidence of Campiti's involvement in cocaine distribution, the scope of the investigation was formally widened to include cocaine dealing. In October and early November, additional warrants or warrant extensions were authorized, including a wiretap of Campiti's home phone and the installation of a listening device, or bug, in his car. On November 17, search warrants were executed at his home in Agawam, the Williams Street stash house, and Westerman's house in Westfield.

When the loansharking indictments were called for conference on December 2, Campiti failed to appear, and a warrant was issued for his arrest. In fact, he had by then absconded to Florida, where he took up residence with his wife under an assumed name and with altered facial features for the next year and one-half. In January, 1987, a Hampden County grand jury heard several days of testimony concerning cocaine trafficking in the Springfield-Hartford area, and on January 30 returned numerous indictments charging Campiti and seventeen other defendants with drug-related offenses. Campiti, of course, could not then be served, and he did not appear for arraignment on the drug charges until his apprehension and rendition from Florida in May of 1988.

Meanwhile, the drug charges against the other seventeen defendants were processed in the regular course. Since a major source of evidence against all the defendants was the product of the electronic surveillance of Campiti's (and others')

---

[8]A pen register on a telephone records phone numbers dialed from that telephone (i.e., outgoing calls). A trap and trace unit records the telephone numbers of incoming calls. A wiretap enables one to eavesdrop on or record a phone conversation.

[9]Travel Majic was associated in some way with both Frank Pugliano and Campiti, who appeared there frequently. Its telephone lines were thought to be involved in their loansharking activities. See *Commonwealth* v. *Westerman*, 414 Mass. at 690.

phones and Campiti's car, and since all the defendants sought suppression of that evidence, one judge was assigned for all the cases. Defense counsel and the judge worked out an arrangement whereby the defendants would join in a single motion to suppress; and two lead counsel, Mr. Vincent Bongiorni of Springfield, who represented Westerman, and Mr. Anthony Cardinale of Boston, who represented Fafone, the Florida supplier, were selected to represent all the defendants in arguing the motion. The hearing on the consolidated motion to suppress occupied four days of court time, from March 7 to March 10, 1988, and the judge filed an extensive written decision on July 21, 1988, applicable to all of the defendants,[10] denying the motion.

Campiti, as was mentioned above, was discovered living in Dania, Florida, in April, 1988, and was promptly arrested on a fugitive warrant. Rendition proceedings resulted in his being transported to Massachusetts on May 3, 1988, and he was arraigned on May 6, represented by Mr. Michael L. Foy. In November, Mr. Foy, who had moved for a continuance in October (this was denied), filed a motion to withdraw his appearance, representing by affidavit that his working relationship with Campiti had broken down and that Campiti had discharged him. After first denying the motion, the judge on reconsideration allowed it and on November 9 appointed the Committee for Public Counsel Services to represent Campiti. He also ordered the case to trial on January 9, 1989, specifying that there would be no continuances. As that date approached, the attorney assigned by the committee, Mr. Richard J. Rubin, moved twice for a continuance, and then for withdrawal, on the ground that he had not had enough time to prepare for trial. The first motion for a continuance was denied, but, although the docket entries do not disclose what action was taken on the second continuance motion and

---

[10]The decision has not been included in Campiti's record appendix. We have obtained it from the appellate records in the Westerman and Fafone appeals. See notes 1 and 2, *supra*. The decision lists the defendants as Joseph Albano, Frank Campiti, Jr., Gina Campiti, Virginia Campiti, Reno Cervalo, Gary Cowles, Peter DiPietro, Joseph Fafone, Aaron Kashmanian, Maria Moses, John Verducci, Gary Westerman, Lawrence Wysocki, Joseph Basile, Pasquale Campiti, Earl Moses, and Ray Jones. The present defendant, Francesco Campiti, had not then been served or arraigned on the cocaine-dealing indictments pending against him. Frank Campiti, Jr., refers to his nephew, who is mentioned in several places in the record before us.

the motion to withdraw, the start of the trial was in fact delayed until February 22, 1989.[11]

On that date Mr. Rubin presented two motions on behalf of Campiti. The first was a motion to suppress all of the electronic surveillance evidence (pen register, cross-frame unit trap, and wiretap tapes). The motion was the same as that used by all the other defendants[12] the previous March. The trial judge, who had himself previously heard and, after four days of hearings, ruled on the identical motion in the other cases was prepared to rule immediately unless Mr. Rubin had something new to offer, which he did not. Anticipating this, Mr. Rubin presented an alternative motion, entitled a "Motion to Preserve the Rights of the Accused." It sought leave of the court to have Campiti treated as if he had been a party to the motion to suppress heard in March, for the purpose of preserving Campiti's right to argue on appeal that the disposition of that motion was in error. The judge denied the motion to suppress and allowed the motion to preserve Campiti's rights. The trial then proceeded, evidence was received along the lines described earlier, including a substantial number of taped conversations, and Campiti was convicted.

Campiti's new trial motion, filed more than three years after his convictions, together with supporting affidavits, a memorandum of law, and appended exhibits, ran many hundreds of pages. A principal contention of the new trial motion was that the motion to suppress the electronic surveillance evidence should have been allowed, most prominently because the affidavit in support of the September 18, 1986, warrant, as well as those that supported the derivative warrants or warrant extensions dated October 10, October 17, October 21 (for Campiti's car), October 30, and November 15, did not show probable cause. Campiti also argued that the formal requirements for electronic surveillance (see G. L. c. 272, § 99) had been violated. The Commonwealth's opposition focused primarily on Campiti's ancillary motions (for

---

[11]This was nearly three and one-half months after the change of counsel, and no separate contention is now made that the judge abused his discretion by failing to accord Mr. Rubin enough time to prepare Campiti's defense.

[12]The motion joined in by the other defendants appears in the appellate records in *Commonwealth* v. *Westerman* and *Commonwealth* v. *Fafone*. See notes 1 and 2, *supra*.

discovery, an expert witness fee, and an evidentiary hearing), arguing that the grounds for the new trial motion had either been waived or lacked substantial supporting evidence (i.e., constituted a fishing expedition).

The judge denied all of Campiti's motions, pointing out that Campiti's trial counsel had in effect waived the right to advance reasons for suppression beyond those that the judge had already considered in connection with the other cases; that, in the hearings at that time, the interests of all the defendants had been represented by Messrs. Cardinale and Bongiorni "with zeal and outstanding legal ability"; that both counsel were "highly regarded [and] experienced" and "had extensive experience in cases involving electronic surveillance in both the [S]tate and [Federal] courts"; that "[e]xtensive hearings were conducted, witnesses and testimony from the tapes themselves were examined"; that the "represented parties' positions were briefed" prior to the decision; and that the allowance of Campiti's motion to preserve his rights put him in the same position as all of the codefendants and fully preserved his rights on appeal.

Apart from arguing the merits of the motion to suppress, Campiti assigns four reasons for his contention that the judge erred in refusing to allow him to reopen the issue of suppression on a motion for a new trial.

1. *Right to participate.* The judge erred, Campiti claims, in ruling that, because he (Campiti) was in default when the joint suppression motion was heard, he had waived his right to be present at and participate in the hearing. As Campiti points out, he was in default, not on the cocaine charges to which the motion to suppress pertained, but on the earlier loansharking charges. Because he had not been served or arraigned on the cocaine charges, he was not in default thereon. If he had been, he argues, at least his lawyer could have participated; but his lawyer had not entered an appearance on the relevant charges. See *United States* v. *Reiter*, 897 F.2d 639, 642-644 (2d Cir. 1990), on which Campiti principally relies.

We do not, however, read the judge's decision as relying on the default[13] but, rather, on the facts that (a) Campiti's mo-

---

[13]The judge *did* mention in his decision on the new trial motion that Campiti was in default in March, 1988, but this was not pivotal to his rul-

tion to suppress was identical to those that the judge had previously heard and rejected, and (b) Campiti's trial counsel in effect acknowledged that he was not prepared to present new or additional evidence to that previously offered by Messrs. Cardinale and Bongiorni on behalf of all the other defendants. This was a reasonable exercise of discretion in the circumstances. It would elevate form over substance to require the judge to do a ritual reenactment of a suppression hearing, where he had already ruled on the motion, and no new material was to be offered. Compare *Commonwealth* v. *Richmond,* 379 Mass. 557, 558 (1980) ("The judge at the second trial had no obligation to conduct another hearing on the motion to suppress, particularly in this case where both counsel agreed that the evidence would be the same as that presented to the first judge"). See also *Commonwealth* v. *Sires,* 413 Mass. 292, 306-307 (1992). Viewed another way, Campiti's trial counsel, in offering the same motion and acknowledging that he was not prepared to make an independent showing in support of it, coupled with his motion to preserve Campiti's rights, was in effect electing to rely on the evidence and the arguments offered at the earlier hearing. This *was* a hearing, although abbreviated because of his decision, in effect, to incorporate by reference the evidence and arguments offered at the earlier four-day hearing. Campiti *was* present for this procedure; thus there was no violation of his right to be present at all stages of the proceedings against him.

2. *Inadequate preparation, denial of continuance.* Campiti does not directly argue that the judge erred in denying his trial counsel's motions for a continuance. Instead, he argues that one effect of the denial was that his trial counsel was.

ing of waiver. His awareness that the defendant was not bound by the ruling on the motion is evident from his reference to Messrs. Cardinale's and Bongiorni's having briefed the motion setting forth "the represented parties' positions." The default, however, could be considered in another regard. If the judge had discretion almost four years after the convictions to reopen the suppression motion (see *Commonwealth* v. *Deeran,* 397 Mass. 136, 139 [1986]; but compare *Commonwealth* v. *Cronk,* 396 Mass. 194, 196-197 [1985]), he could properly take into consideration the ample evidence in the record (from a bail reconsideration hearing in June, 1988) that the defendant was kept fully apprised of the progress of the cocaine-trafficking indictments during his year and one-half absence in Florida, including, specifically, the proceedings on the motion to suppress, and that, inferentially, he remained in default on the loansharking indictments in part to avoid being served with the cocaine-trafficking indictments.

forced, by the lack of adequate preparation time, to rely on the arguments made by Messrs. Bongiorni and Cardinale on their clients' motions to suppress; by reason of which, he contends, he should now, posttrial, be permitted to raise contentions not put to the trial judge, in the usual course, before the trial.

Mr. Foy filed his appearance for Campiti on the drug-trafficking charges in May, 1988, ten months before the ultimate trial date. He filed an indefinite motion for a continuance which was denied in October. No reason was assigned for the continuance, but, shortly thereafter, he filed his motion to withdraw based on the breakdown of his relationship with, and his discharge by, Campiti. This was allowed, and the Committee for Public Counsel Services, appointed to represent Campiti on November 9, assigned Mr. Rubin to the case on November 14. The latter filed two motions for a continuance, one in late December and another in early January, shortly before the assigned trial date, underscored by a motion to withdraw for lack of preparedness. The January motions, so far as the docket entries show, went unacted upon, from which the defendant invites us to conclude that they were implicitly denied; but remarks in open court by the trial judge indicate that the first session judge did in fact continue the case to accommodate the defendant, and the trial did not begin for another month and a half. The record, therefore, does not bear out that Mr. Rubin was not given at least some of the additional time he sought. Contrast *Commonwealth* v. *Cavanaugh*, 371 Mass. 46, 51 (1976), in which the court, quoting from *Ungar* v. *Sarafite*, 376 U.S. 575, 589 (1964), characterized the one week allotted to defense counsel from assignment to trial as " 'a myopic insistence on expeditiousness in the face of a justifiable request for delay.' " So too, *Commonwealth* v. *Faulkner*, 418 Mass. 352, 364-365 (1994), where the defendant's counsel was given no time to prepare a defense.

3. *Inadequate preparation, ineffective assistance of counsel.* We know from Mr. Rubin's statements to the judge at trial that Mr. Foy had turned over to him a large number of records that came from the electronic surveillance of Campiti's and Travel Majic's telephone lines and Campiti's car, and that Mr. Rubin had expended considerable time comparing the transcripts of intercepted conversations with the corre-

sponding tapes, although he had not gotten through all the tapes. We assume in the absence of anything in the record to the contrary that he had copies of the affidavits on which the warrants were based. He obviously had the joint motion to suppress and the judge's decision thereon. During the three and one-half months that he had to prepare for trial, the prosecutor supplied him with revised transcriptions of some but not all of the intercepted telephone conversations, based in part on hearings, apparently in relation to the joint motion to suppress, in which, as the trial judge said, "I sat and listened to virtually every tape and compared them to the transcript while counsel were present. There were written findings made." In these circumstances, Mr. Rubin could reasonably conclude that his preparation time would be less usefully spent on rehashing the grounds of the motion to suppress and in challenging the accuracy of the transcripts of the intercepted telephone conversations, than in thoroughly familiarizing himself, as the trial transcripts make clear that he did, with the substantial mass of evidence that the district attorney's investigation had amassed against Campiti. Mr. Rubin's decision, in effect, to rely on the intensive work done by the other attorneys in attacking the electronic surveillance tapes and the transcripts of the intercepted conversations, was a prudent decision, especially given the judge's willingness to preserve Campiti's rights on appeal. It was certainly not, in the words of *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), "behavior of counsel falling measurably below that which might be expected from an ordinary, fallible lawyer." 366 Mass. 89, 96 (1974). Moreover, as will be discussed more below, it has not been shown that any omission in that regard "likely deprived the defendant of an otherwise available, substantial ground of defence." *Ibid.*

4. *Failure of trial counsel to question probable cause.* In his new trial motion, and in his argument on appeal, Campiti argues that various grounds that should have been addressed for suppression of the electronic surveillance evidence were not in fact put forward by Messrs. Bongiorni and Cardinale in support of the joint motion to suppress: most particularly, the absence of probable cause for the September 18, 1986, warrant, and the derivative warrants. For that reason, he argues, the failure of his own trial counsel to raise the probable cause issue constituted ineffective assistance, and it was

error to deny Campiti the right to raise it on a new trial motion.

Probable cause is the central issue in any application for a warrant, and it is superficially implausible to imagine that the experienced counsel who presented the joint motion would have ignored it. The record before us does not substantiate that it was ignored. It was raised in the suppression motion itself (which, it will be recalled, was copied as Campiti's own motion). The record before us in this appeal does not include the transcripts of the suppression hearing[14] or the legal memoranda supporting and opposing the motion. Of particular significance is that certain affidavits that were incorporated in and attached to Trooper Higgins' affidavit supporting the September 18 warrant application[15] are not included in the record appendix. Even the judge's written decision on the motion has been omitted, although we have been able to obtain the judge's decision from the appellate record in *Commonwealth* v. *Westerman, supra,* and have examined it. It does not support the contention that probable cause was not considered and ruled upon. The judge, having ruled that the warrant authorizing installation of certain pen registers in February and March, 1987, was invalid,[16] proceeded to apply the test laid down in *Commonwealth* v *Nine Hundred and Ninety-two Dollars,* 383 Mass. 764, 768 (1981), and followed in *Commonwealth* v. *Assad,* 393 Mass. 418, 422 (1984), and *Commonwealth* v. *Valdez,* 402 Mass. 65, 72 (1988). After excising from the September warrant application the information derived from the invalidly approved pen registers, he determined that the balance of the lengthy warrant application did show probable cause for the issuance of the critical September 18 warrant. This ruling was explicitly affirmed on appeal in *Commonwealth* v. *Westerman,* 414 Mass. at 691,[17] and that ruling was part of the ratio decidendi. Hence, we decline to predicate this decision on an unsupported assertion

[14]Although previous counsel for Campiti who presented the new trial motion appears to have received them.

[15]This includes Trooper Higgins' previous affidavits of February 5, February 27, and April 11, 1986, all of which were attached to the September 18, 1986, affidavit and were expressly reaffirmed therein.

[16]The reason was that the warrant applications had been signed by a State police officer rather than by the district attorney, as the statute requires. See G. L. c. 272, § 99 F 1.

[17]The relevant passage of *Westerman,* 414 Mass. at 692, reads:

that probable cause was not considered and ruled upon in the proceedings on the joint motion to suppress.[18]

Campiti also argues that the various warrant extensions and new warrants that were issued after September 18, 1986, were not supported by affidavits showing probable cause. It is true that nothing in the trial judge's decision or in the decision by the Supreme Judicial Court in Westerman's appeal is expressly addressed to the showings of probable cause in the succeeding affidavits[19]; and it is also true that Westerman's brief does not address probable cause in relation to the later

"We recognize that some of the information obtained from the [invalid] pen registers was incorporated into other parts of the affidavit. We also acknowledge that the affidavits supporting those pen registers were attached to the wiretap application. However, even if all these materials were excised from the application, there still exists ample evidence to establish the requisite probable cause for a warrant to issue. See G. L. c. 272, § 99 E. The bulk of the thirty-eight pages concerns meetings with confidential informants who provided the police with new information regarding the loansharking activities of the Pugliano-Campiti ring. There is no evidence that this information was in any way dependent on the earlier pen registers. See *Commonwealth* v. *Jarabek*, 384 Mass. 293, 300 n.7 (1981) (whether witness's testimony was independent and not derived from unlawful interception is proper issue for motion to suppress). Therefore, because the warrant was supported by sufficient probable cause independent of the objectionable material, the defendant fails to carry his burden. See *Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978) . . . ; *Commonwealth* v. *Assad*, 393 Mass. 418, 422 (1984). . . ."

[18]It is, of course, open to Campiti to argue in his direct appeal that the judge erred in concluding that the balance of the affidavit, after excising the invalid pen register information, showed probable cause for issuance of the warrant. But this is the very same question that was ruled on by the Supreme Judicial Court in the *Westerman* appeal, and an examination of the affidavit supporting issuance of the warrant does not cause us to doubt the correctness of its conclusion. This is because the information supplied by Paul Bousquet, a victim, corroborated by Paul Mazur, Bousquet's employee, as matter of law showed probable cause that Campiti, Pugliano, and Frederic Tricinella were engaged together in loansharking and that Travel Majic and its phone lines were employed therein. The information supplied to Higgins by Robert Proulx, as related in Higgins' September 18 affidavit, made an adequate showing that Campiti's home phone was also used in the loansharking operation. (Omitted from the record is another, earlier affidavit concerning information from Proulx, which was one of those incorporated — see note 15, *supra*, in the September 18 application.)

[19]The issue was, of course, within the scope of the joint motion to suppress, which was addressed not only to the information derived from the September 18 warrant but also to all of the electronic surveillance evidence, most of which was derived from the succeeding warrants.

warrant applications, with one cursory exception. But if it was not argued, the reason, we think, is obvious: the argument would be essentially specious. The subsequent affidavits, including those of October 10, which sought a tap on Campiti's home phone, and October 21, which sought authority to plant a listening device in Campiti's automobile, incorporated the critical September 18 affidavit and added to it information gleaned both from electronic surveillance authorized by the September 18 warrant and from independent police observations (such as the fortuitous sales of cocaine by Rego to undercover officer Pehr Holmes and the subsequent observation of frequent contacts between Campiti and Rego). By October 21 it had become apparent that a frequent modus operandi of Campiti was to talk briefly to operatives and suppliers in coded language,[20] arrange to meet, usually within the hour, at a roadside location, then go for a short ride together in Campiti's rented (and frequently changed) car, during which time, it could be reasonably inferred, business was discussed.[21]

5. *Police misconduct.* There is no question that new evidence that investigating officers falsified warrant applications or lied in testimony is an appropriate ground for a new trial or, in egregious cases of misconduct or deliberate misconduct involving a serious threat of prejudice, dismissal of charges. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 210 (1983). Campiti

[20]In a wiretapped conversation on October 10, 1986, at 9:30 P.M., Campiti is heard cautioning an associate who is bordering on getting too explicit:

UNIDENTIFIED MALE: "They starting to get to him . . . that guy just called me. . . ."

CAMPITI: "Okay talk in riddles . . . ."

[21]One example is a wiretapped conversation (on October 11, at 7:02 P.M.) that reads, in part:

"WESTERMAN: "Yeah, I got a guy that's going to be calling me tomorrow (inaudible) I got, I just picked up a a guy for four a week."

CAMPITI: "Man, don't, don't talk too much. Do you, you want to see me. Do you want me to see ya or what."

WESTERMAN: "Yeah, I got."

CAMPITI: "What time."

WESTERMAN: "About 7:30."

CAMPITI: "What time is it now."

WESTERMAN: "About 5 or 10 after."

CAMPITI: "Alright the same spot."

WESTERMAN: "Yeah. . . ."

argues that police misconduct in this case requires a new trial and should have been the subject of an evidentiary hearing. The judge, as noted earlier, heard the parties at a nonevidentiary hearing on the subject of whether he should order further discovery, approve a fee for an expert witness in electronic surveillance, and conduct an evidentiary hearing on the new trial motion. All were implicitly denied.

The judge correctly concluded that Campiti's showing of police misconduct was too insubstantial to warrant an evidentiary hearing. Campiti's showing of misconduct contained two distinct elements, which are woven into many parts of his brief on appeal.

a. False statements in warrant affidavits. The affidavits supporting the warrant applications for the electronic surveillance — almost all by Trooper Higgins — ran to nearly three hundred pages and contained information from many different sources: named witness statements; confidential informant statements; information from Connecticut and Florida police; telephone records obtained under G. L. c. 271, § 17B; pen register, trap and trace unit, and wiretap intercept information; and on-the-ground surveillance of Campiti's and other suspected conspirators' movements by the police. It is hardly surprising that, in the welter of information obtained from different sources, there are occasional statements that are either somewhat at variance with other statements, or, in a few instances, contradictory. One theme in the defendant's argument consists of identifying such variations or contradictions and suggesting that one or the other or both are, in an oft repeated phrase, "deliberate false misstatements by Higgins to deliberately mislead the issuing judge in finding probable cause." Most of these instances of contradiction are apparent on the face of the affidavits and are not properly the subject of a motion for a new trial. Some are shown by new evidence, not apparent on the face of the affidavits. An example dwelt on at length is the slight variations between the statements of Paul Bousquet (given to the police May 4, 1986) and Paul Mazur (given to the police August 13, 1986), whose information was paraphrased in Higgins' September 18 warrant affidavit without highlighting variations. Campiti's brief blows these out of all proportion to suggest a plan by Higgins to mislead the judge. On careful examination the variations are slight and are plausibly explained by the paucity of informa-

tion given to Mazur by Bousquet concerning the nature of his dealings with Campiti. Moreover, the variations are faithfully reproduced in Higgins' own paraphrase of Bousquet's and Mazur's statements. The suggestion that Higgins' failure to attach the statements themselves to his affidavit was an attempt by him to conceal and mislead is excessive.[22]

The defendant also makes much of information from a retired telephone company employee, furnished months after the trial, indicating that he could only find in the company's records one request by a law enforcement agency for toll call records and that it was dated November 26, 1986, after the warrant affidavits at issue (September 18 through November 15, 1986). From this the defendant argues that the affidavits' renditions of toll calls made from certain numbers were the product of an illegal surveillance. The conclusion seems on its face far-fetched. The toll records were available to the district attorney on request, without a showing of probable cause. See G. L. c. 271, § 17B. That he would obtain surreptitiously what he could obtain for the asking is less plausible than that the record search was incomplete or that the records were destroyed. On its face, the reply to defense counsel's inquiry indicated that some records from the period were no longer available.

The impression one takes away from pondering these and a dozen or so other alleged "false and deliberate misstatements" is that they constitute, at best, a collection of unpatterned nicks in an impressive edifice of evidence constructed by the district attorney's investigation, hardly undermining its essential soundness. The judge was justified in concluding that they did not constitute a "substantial preliminary showing" of false statements made knowingly and intentionally, or with

[22]Campiti also argues that G. L. c. 272, § 99 F 3, was violated by a failure to annex the Bousquet and Mazur interrogation transcripts to the September 18 warrant application, but he cites no authority suggesting that suppression is mandatory in circumstances where the original transcripts would have added nothing to the application but an additional 126 pages. A further argument is that Higgins' affidavit improperly bolstered Bousquet's credibility by "concealing" the fact that the Department of Labor and Industries had brought twenty-one criminal complaints against Bousquet for failure to pay his employees their wages in the final two weeks before his roofing business collapsed. Bousquet's inability to meet his payroll was clear, however, from Higgins' affidavit, and there is no showing that the criminal complaints, which predated the affidavit by several months, had not been disposed of.

a reckless disregard for the truth. See *Commonwealth* v. *Honneus*, 390 Mass. 136, 142 (1983).

b. *The Mace conviction.* On March 23, 1990, a little over a year after Campiti's convictions on the cocaine charges, one of the State police officers involved in the lengthy investigation, Detective Lieutenant John Mace, was himself convicted of embezzling money from the district attorney's office to support his gambling habit. His thefts were uncovered beginning on October 23, 1989, when a young assistant district attorney returned to the office in the evening to prepare for a trial the next day. He surprised Mace, who was about to burn files to conceal his defalcations. A struggle ensued, in which Mace, armed with a knife, attacked the assistant district attorney, who managed to trip a fire alarm.

Campiti had been convicted in March of 1989, but Mace had been Trooper Higgins' superior and his thefts were shown to have been ongoing during the time of the Campiti prosecution.[23] Mace had been a witness at the trial, and he had executed one of the two affidavits offered in support of the November 15, 1986, warrant extension. These involvements are enough, Campiti argues, to taint a significant part of the evidence used to convict him and to require a new trial.

The judge declined so to rule. He reasoned that it was pure speculation that Mace might have committed illegal acts separate from the embezzlements, which themselves had no bearing on the evidence against Campiti. He ruled that Campiti had showed "only that [Mace] acted in a separate, distinct and unconnected way committing an unlawful act that had no connection with his law enforcement activities." Moreover, the judge continued, "[T]here is no basis upon which it can be shown that the prosecutor knew of these unlawful activities on the part of the police officer. Indeed, they were uncovered in a violent attack on an assistant district attorney that took place after the conviction of the defendant."

This ruling was entirely appropriate. Nothing in the incident, however shocking, "casts real doubt on the justice of [Campiti's] conviction." *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). As Mace's wrongdoing was not to be discovered for another seven months, he had no motive to

---

[23]The money Mace was stealing was money seized by various officers in the course of narcotics investigations, including Campiti's.

curry favor with the prosecution by his testimony. If Mace's wrongdoing could be regarded as (in a trial-tactics sense) exculpatory evidence, and he himself as a "member of the prosecution team," still the defendant's syllogism breaks down: in a closely analogous situation the court has rejected the conclusion that the prosecution withheld exculpatory evidence. See *Commonwealth* v. *Waters*, 410 Mass. 224, 229 (1991) ("we have never held or suggested that actions taken by such officers, not in furtherance of law enforcement but rather in pursuit of an unlawful scheme of their own, such as robbery or extortion, are attributable to the prosecution"). A general request for exculpatory evidence does not compel the prosecution to investigate the backgrounds of its witnesses. *Commonwealth* v. *Monteiro*, 396 Mass. 123, 129 (1985). Mace's activity is not shown in any way to taint the voluminous evidence against Campiti. At best, it might, if known to the jury, have had a bearing on his credibility as a witness; but such evidence does not ordinarily warrant a new trial. *Commonwealth* v. *Toney*, 385 Mass. 575, 581 (1982). *Commonwealth* v. *Ramirez*, 416 Mass. 41, 47 (1993). Moreover, Mace, although Trooper Higgins' superior, played a secondary role in the narcotics investigation and a very minor role in the trial. It was Higgins who was the principal investigator and the prosecution's principal police witness, and it was he who signed all but one of the affidavits supporting the various warrant applications. The judge did not err in finding no substantial risk that the jury might have reached a different conclusion had it known of Mace's unrelated wrongdoing. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 412-413 (1992).[24]

## MISCELLANEOUS ISSUES

The defendant raises numerous other arguments which we have considered and determined either have no merit or represent harmless error. Some are argued in connection with

[24]Similar considerations govern the defendant's suggestion that the prosecution withheld exculpatory evidence by failing to disclose a pending civil action for deprivation of civil rights naming Higgins as one of several officers who illegally gained entry to the plaintiff's premises and seized contraband therefrom. The allegations of the complaint would not properly have been disclosed to the jury and thus would not have been a factor in their discussions. Contrast *Commonwealth* v. *Tucceri*, 412 Mass. at 414-415.

the new trial motion, others in connection with the direct appeal or with both. We discuss briefly only a few.

1. *Instruction on reasonable doubt.* Campiti contends that the judge's instruction on reasonable doubt was constitutionally deficient. Although the judge prefaced the instruction with two sentences modeled on the now disapproved charge in *Commonwealth* v. *Little*, 384 Mass. 262, 266, n.4 (1981) (see *Commonwealth* v. *Santos*, 402 Mass. 775, 788 [1988]), concerning what proof beyond a reasonable doubt does *not* mean, he then proceeded (as the judge in *Little* did not) to read the approved charge from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), in full and substantially verbatim. Moreover, the prefatory material did not include those portions of the *Little* charge that misstate the concept of proof beyond a reasonable doubt, and nothing in the prefatory material diluted the concept.

2. *Pen register unreliability.* Pointing to ten or eleven instances where there is a discrepancy between the pen register tapes and the transcripts of intercepted calls, usually involving either the time of the call or whether it was incoming or outgoing, Campiti argues that an inference must be drawn that the pen register machines were unreliable, and hence the tapes should not have been admitted in evidence, or, alternatively, that the police tampered with the evidence. The inferences are far fetched. An objection at or before trial might have resolved the discrepancies, had it been taken, but the game was not worth the candle, as, compared to the intercepted conversation themselves, and to the testimony of Rego and Labriola, the pen register tapes were of little trial significance. Contrast *Commonwealth* v. *Neal*, 392 Mass. 1 (1984), concerning breathalyzer machines, the evidence from which is typically pivotal.

3. *Compliance with 18 U.S.C. § 2518(8)(a) (1982) and G. L. c. 272, § 99 M.* Under these statutes a return must be made to the judge issuing an electronic intercept warrant "immediately" (§ 2518[8][a]) or within seven days (§ 99 M) following termination of the warrant or the last renewal thereof. *Commonwealth* v. *Westerman*, 414 Mass. at 698-699. As to the consequences of delay, see and compare *Commonwealth* v. *Vitello*, 367 Mass. 224, 274-275 (1975) (short delays may be excused if there is no prejudice); *United States* v. *Mora*, 821 F.2d 860, 867 (1st Cir. 1987) (where return and sealing

are delayed, evidence can only be used if there is a "satisfactory explanation" for the delay); *United States* v. *Ojeda Rios,* 495 U.S. 257, 264 (1990) (government must explain why a delay occurred and, in addition, why it is excusable). Campiti argues that the warrant of October 21 authorizing a listening device within his car terminated by its own terms on November 8 and that the *Westerman* decision (414 Mass. at 697, n.6) incorrectly characterized the November 12 order as an extension of the October 21 warrant, with the result that the return on the October 21 warrant was not timely. By his failure to include the relevant warrants and orders in the record appendix, however (as well as his failure to make appropriate record reference in his brief), the defendant leaves us unable to determine the factual basis for this argument.

4. *Compliance with G. L. c. 272, §§ 99 F g, 99 I 5, and 99 O 1.* Campiti argues that the Commonwealth failed to comply with the provisions of the electronic interception statute by failing to obtain in the warrants express authorization to make secret entry upon the premises of Travel Majic or into the Campiti home or its curtilage in order to install the pen registers, trap and trace units, and the wiretaps of those phones. Section 99 F g requires that a warrant application disclose that surreptitious entry will be necessary to install the intercept device, if that be the case, and § 99 I 5 requires that the resulting warrant give express authorization for the entry. In these cases the district attorney's office informed the judge that secret entry would not be necessary, except as to the bug in Campiti's car authorized by the October 21 warrant, which did necessitate secret entry for the installation. The difficulty with this argument is the factual predicate: Campiti makes no substantial showing that any entry into the business premises of Travel Majic or Campiti's home was necessary to effect installation.[25]

Section 99 O 1 requires that the defendant be furnished

_____

[25]Campiti draws an inference from two sources that secret entries were necessary. First, in the *Fafone* case (see note 1, *supra*), the Commonwealth, according to Campiti, stated that a delay was involved in executing some unspecified warrant because "physical installation would be necessary." It is speculative, however, to infer that the physical installation would have to take place on private premises rather than at some other point in the telephone lines. (The same applies to Higgins testimony concerning the delay in installation.) The second is that the telephone company, in answers to interrogatories, is said to have stated that lease lines were not furnished

with certain records relative to intercepts at least thirty days before trial, failing which the records will be inadmissible, even in the absence of a pretrial motion to suppress. *Commonwealth* v. *Picardi,* 401 Mass. 1008, 1008-1009 (1988). Here, again, the factual predicate falls short. Trooper Higgins testified that all relevant records were furnished. We know that Mr. Foy and Mr. Rubin both received voluminous records, although the defendant does not specify what records they received. The defendant assumes some were missing because certain pen register tapes cannot now be found in the sealed and stored records. The judge was not required to infer that some relevant records or tapes (i.e., copies) were not furnished to the defendant.

5. *Unauthorized intercepts.* Campiti also argues that the investigators exceeded the scope of the warrant issued on October 21 authorizing the listening device in Campiti's car. The car Campiti then drove was described in the application as a Buick Skylark. Three years later, at trial, Trooper Higgins testified that the bug was planted in an Oldsmobile Cutlass. From this Campiti now argues that the investigators exceeded the scope of the warrant. The warrant itself has not been included in the record appendix. The return on the warrant and several status reports, however, indicate that Higgins was probably mistaken in his memory. The status reports stated that the bug was installed in the Buick Skylark on October 25; that two conversations were recorded that day and one on October 26; that on October 27, Campiti returned the Buick to the rental agency and flew to Florida; that on his return he rented an Oldsmobile Cutlass; and that the Commonwealth intended to transfer the bug to that car but apparently did not get around to it. If, contrary to the status reports, the transfer was made, there was no prejudice to the defendant, because the only car tapes offered in evidence were those from October 25 and 26. Moreover, without the warrant, we do not know that it did not authorize such a transfer.

6. *Other shortcomings of defendant's trial counsel.* On appeal, Campiti argues that his "trial counsel made error after

in the intercepts, which, Campiti argues, implies that the investigators must have made physical entry on the premises. But the telephone company answers, which are in the record, simply do not say what Campiti attributes to them, and, if they did, the inference he draws requires explanation that does not appear.

error," most of which he attributes to lack of preparation. The most significant allegations of error have already been dealt with in connection with the new trial motion. Other allegations of error similarly lack merit. The failure of trial counsel to obtain Rego's and Labriola's criminal records for impeachment purposes could not have misled the jury into thinking they were upstanding citizens. Both admitted to trafficking in cocaine. Labriola testified that he offered to assist the Commonwealth in order to get out of prison. Both admitted to having criminal charges pending against them and to their hopes for lenient treatment (and, in Rego's case, for the Commonwealth to refrain from bringing criminal charges against his wife). The jury, in other words, knew they were criminals without knowing their specific criminal histories.

Trial counsel is faulted for having failed to obtain the transcripts of the suppression hearings and of the Westerman trial (Westerman was tried in September, 1988, five months before Campiti) for use in impeaching witnesses; but the record does not show when these transcripts became available. Trial counsel is also faulted for a failure to move for State funding of an expert witness to listen to the tapes for accuracy of the transcripts, to offer a different interpretation of their meaning from that offered by Trooper Higgins,[26] and to testify concerning tape tampering.[27] This contention too is meritless. There is no support in the record for the suggestion

---

[26]The conversations were in abbreviated, or coded language, as described earlier, and would sound like meaningless gibberish to a casual observer. Trooper Higgins, who had spent months collecting the tapes and coordinating the investigation, was permitted to offer his interpretation of the subject matter discussed and to tell whether numbers used in the conversations referred for example, to dollars, ounces, or kilos. There was in our view nothing improper in this procedure, without which the jury could have made little or no sense of most of the tapes. Higgins had a basis for his opinion. Hence, if Campiti is overheard saying to Fafone that he is coming to Florida to get "one," or "two," and the next day flies to Florida and, according to Rego or Labriola, purchases one or two kilos of cocaine, Higgins is in a position to assist the jury listening to the tape by explaining that the numbers used in the tape refer to kilos of cocaine. The defendant cites no authority for his argument that allowing Higgins so to testify was error.

[27]The suggestion of tape tampering in Campiti's brief refers to a process of "merging" tapes that was gone into in detail in a pretrial hearing in the Westerman case. The bug in Campiti's car was a microphone that transmitted a signal that could be picked up and recorded in police surveillance vehicles. Because Campiti's car was in motion and it could not be predicted where it would go, the police had three vehicles monitoring and recording

that the transcripts may have been inaccurate. They were listened to repeatedly by the judge and counsel and compared with the transcripts, with no suggestion of significant inaccuracy. Moreover, it was the tapes, not the transcripts, that were put in evidence in the case (although the jurors were shown the transcripts as an aid in understanding the tapes), and the jurors could form their own judgments about their content in marginally audible portions.

It is true that Campiti's trial counsel, Mr. Rubin, was very brief in his argument on sentencing. Campiti was faced with five convictions carrying mandatory minimum sentences of ten years. Mr. Rubin urged that the sentences be made concurrent. He did not attempt to argue for leniency from such factors as employment history, stable family situation, or good works in the community. In the course of these lengthy proceedings Campiti's activities and lifestyle had become well known to the judge, and any apologia would have been unrealistic. Unlike *Commonwealth* v. *Lykus,* 406 Mass. 135, 145-146 (1989), in which the defendant was involved in a variety of activities that should have been argued in mitigation, but very much like *Commonwealth* v. *Mamay,* 407 Mass. 412, 425 (1990), in which none were suggested, Campiti "has failed to bring to our attention any redeeming attributes which could have been raised by counsel. In the absence of a showing that a different result might have been attained, we cannot say that counsel's performance was ineffective." *Ibid.*

Stepping back from the specific allegations of errors by trial counsel, we detect no lack of preparation. Mr. Rubin showed a thorough mastery of the record and examined and cross-examined witnesses with skill and thoroughness. Realistically, any hope the defendant might have had for acquittals dissolved when the judge allowed the use of the intercepted conversations. Any doubts that the jury might have had concerning the testimony of Rego and Labriola, whose motives and character were effectively impugned by

the broadcast signal. Clarity of reception would vary depending on distance and interference, so that some portions of a conversation would be heard more clearly on one recording and other portions on another recording. The investigating officers would later make a single "merged" tape using the clearest portions of the separate tapes. The trial judge specifically found that the procedure was proper and the merged tape accurate. Campiti's trial counsel did not raise the issue again.

Mr. Rubin, must have vanished when the tapes were played, confirming rather conclusively, by his own words, their testimony and the other evidence effectively marshalled by the Commonwealth. Campiti was done in, not by the ineffectiveness of his trial counsel, but by the testimony of his associates and, in the end, himself.

*Judgments affirmed.*

*Order denying motion for new trial and ancillary motions affirmed.*