**Francesco CAMPITI, Petitioner,**

v.

**James MATESANZ, Respondent.**

**No. CIV.A. 97–30263–MAP.**

United States District Court,
D. Massachusetts.

Feb. 28, 2002.

As Modified March 11, 2002.

Vincent A. Bongiorni, Springfield, MA, for Petitioner.

Cathryn A. Neaves, Attorney General's Office, Boston, MA, for Respondent.

## MEMORANDUM REGARDING PETITIONER'S REQUEST FOR A WRIT OF HABEAS CORPUS

(Docket No. 1)

PONSOR, District Judge.

### I. INTRODUCTION

*Habeas corpus* petitioner Francesco Campiti ("Campiti") argues that he has been wrongly imprisoned following convictions on five counts of trafficking in cocaine in excess of 200 grams. Campiti's arguments can be broken into five categories: (1) appellate delay; (2) ineffective assistance of counsel; (3) prosecutorial misconduct; (4) improper amendments to the indictment; and (5) insufficiency of the evidence.

As will be seen, each of these claims must be rejected. First, the delay in the appellate process, while shocking, did not prejudice Campiti. Second, Campiti's counsel was not constitutionally ineffective. Third, although the prosecution had a duty to disclose the secret corruption of one of its police officers, its failure to fulfill that duty did not prejudice Campiti. Fourth, the amendments to the indictment gave sufficient notice to Campiti of the charges against him. Finally, there was sufficient evidence for the jury to convict Campiti on all five counts.

### II. PROCEDURAL AND FACTUAL BACKGROUND

The story giving rise to this petition is long and detailed, spanning nearly fifteen years.[1] In 1986, the district attorney's office in Hampden County, Massachusetts convened a grand jury to investigate loan sharking activity conducted by Frank Pugliano ("Pugliano") and Campiti. *Commonwealth v. Campiti*, 41 Mass.App.Ct. 43, 52, 668 N.E.2d 1308 (1996). Pugliano and Campiti were believed to be high ranking members of the "Pugliano–Campiti" organized crime family. (Docket 12, Exhibit 2 at 5). The grand jury's focus, however, soon shifted to Campiti's drug trading activity. 41 Mass.App.Ct. at 52, 668 N.E.2d 1308. Surveillance conducted during the loan-sharking investigation, *id.* at 53, 668 N.E.2d 1308, soon revealed Campiti to be one of the leaders of a sizeable drug importing and distribution business operating in the Springfield–Hartford area. *Id.* at 44, 668 N.E.2d 1308.

In October and November of 1986, the Commonwealth began conducting additional surveillance to uncover the suspected drug activity, including audio surveillance of Campiti's home and car. *Id.* at 53, 668 N.E.2d 1308. On November 17, 1986, the Commonwealth executed three search warrants: at Campiti's home in Agawam, at a "stash house" on Williams Street in Springfield, and at co-defendant Gary Westerman's ("Westerman's") house in Westfield. *Id.*

---

1. This summary relies heavily on the Massachusetts Appeals Court's findings of fact. These findings are "presumed to be correct" under 28 U.S.C. § 2254(e)(1). To challenge the state court's factual findings on collateral review, Campiti was required to rebut this presumption with "clear and convincing evidence." *Id.* For the most part, Campiti did not attempt to do so. To the extent that an attempt was made, it was not successful.

Soon after the execution of the search warrants, Campiti fled to Florida. *Id.* He altered his facial features, took an assumed name, and lived with his wife in Dania, Florida for a year and a half. *Id.* A fugitive warrant was issued for him. *Id.* at 54, 668 N.E.2d 1308.

Meanwhile, a Massachusetts grand jury issued an indictment against Campiti and seventeen other defendants in January, 1987. *Id.* at 48, 668 N.E.2d 1308. Campiti was charged with nine counts of trafficking in cocaine. By the time of trial, only five counts remained.

While Campiti was still a fugitive in Florida, proceedings began against the seventeen co-defendants. *Id.* A major source of the evidence against all eighteen defendants was the electronic surveillance conducted at several of the defendants' homes, and in Campiti's car. *Id.* at 53–54, 668 N.E.2d 1308. All of the defendants sought to have this evidence excluded at trial and joined in a single motion to suppress. *Id.* at 54, 668 N.E.2d 1308. Two lead counsel were selected to represent all the defendants for purposes of the suppression motion.[2] *Id.* A hearing was conducted on the motion to suppress from March 7 to March 10, 1988. *Id.* On July 21, 1998, the judge issued an extensive written decision denying the motion. *Id.*

On May 6, 1988, about two months after the suppression hearing, and about two months before the written suppression decision was issued, Campiti was arrested and returned to the Commonwealth. *Id.* As the case against Campiti proceeded towards trial, the Commonwealth tried Westerman separately. He was convicted on September 30, 1988. Westerman's trial and appeal are discussed at 414 Mass. 688, 611 N.E.2d 215 (1993).[3]

Campiti was arraigned on May 6, 1988, represented by Michael Foy ("Foy"). *Commonwealth v. Westerman,* 41 Mass. App.Ct. at 54, 668 N.E.2d 1308. Six months later, Foy moved to withdraw. *Id.* On November 9, 1988, Richard J. Rubin ("Rubin") was appointed as trial counsel with a trial scheduled for January 9, 1989. *Id.* On December 23, 1988, Rubin filed a motion to continue the January trial; the motion was denied, with an indication that there would be no further continuances. *Id.* On January 3, 1989, Rubin moved to withdraw, asserting that he was not prepared for trial. *Id.* The trial court denied the motion, but postponed the trial date to February 22, 1989. *Id.* at 54–55, 668 N.E.2d 1308.

In the end, Rubin had approximately three and one-half months to prepare for trial. *Id.* at 55, 668 N.E.2d 1308. On the opening day of trial, Rubin presented two motions. *Id.* First, he filed the same motion to suppress the electronic evidence that had previously been filed by the defendants jointly. *Id.* Since Rubin had nothing new to offer, the trial judge was prepared to rule immediately. *Id.* Rubin's second motion sought leave to have Campiti treated as if he had been a party to the joint motion to suppress for purposes of appeal. *Id.* This motion was allowed, and the motion to suppress was denied. *Id.* The trial commenced.

On the second day of trial, the Commonwealth moved to amend the indictment.

---

**2.** One of the lead counsel for the suppression motion was Vincent Bongiorni of Springfield, Massachusetts, who is now representing Campiti in this petition. At the time, Attorney Bongiorni was representing Westerman.

**3.** Further facts may also be found in *Commonwealth v. Fafone,* 416 Mass. 329, 621 N.E.2d 1178 (1993), which set aside the conviction of Joseph Fafone. The SJC found that although there was clear evidence that Fafone sold cocaine to Campiti in Florida, there was no evidence that Fafone knew that Campiti would distribute that cocaine in Massachusetts. *Id.* at 330–331, 621 N.E.2d 1178.

As noted, the grand jury originally indicted Campiti with nine counts of trafficking in cocaine, which were reduced to five by the time of trial. The first three counts specified dates: November 1, 1986; November 4, 1986; and November 8, 1986. The last two charged Campiti with trafficking in cocaine "on or before November 17th, 1986."[4] (Docket 85, Exhibit A). The motion to amend sought to replace the date of the first three indictments with "on or before November 17th, 1986." *Id.*, Exhibit E.

Rubin objected on the ground that "being less specific" made the Commonwealth's "burden a little bit less in proving the specific time." *Id.*, Exhibit F at 4. The Commonwealth responded by noting that "the date is not an element of the crime," and also pointed out that it had responded fully to the Bills of Particulars filed by Campiti some months earlier, outlining the expected testimony of Campiti's two cooperating co-defendants. *Id.* at 5. The trial judge allowed the motion to amend. *Id.* at 9.

At trial, Campiti faced evidence from several sources. Arguably, the most damaging evidence stemmed from the testimony of his co-conspirators and distributors. Joseph Rego ("Rego"), agreed to testify so that the Commonwealth would not bring charges against his wife. 41 Mass.App.Ct. at 70, 668 N.E.2d 1308. He told the jury about three trips to Florida during which Campiti bought large amounts of cocaine. *Id.* at 43, 45, 668 N.E.2d 1308. Rego testified that in June, 1986, he traveled with Campiti to Fort Lauderdale where Campiti purchased a kilogram of cocaine, which he turned over to Westerman for redistribution. *Id.* Westerman returned with the proceeds, and Campiti used these to purchase two additional kilograms of cocaine, which Westerman, Rego, and Campiti brought back on an airplane to Massachusetts. *Id.*

Rego also testified that in September, 1986, he flew again with Campiti to Fort Lauderdale, and witnessed Campiti again purchasing a kilogram of cocaine. *Id.* Rego helped smuggle the kilogram back to Massachusetts, and helped Campiti divide the kilogram into packets for sale. *Id.*

Rego testified as well that in October, 1986, he met Campiti in Fort Lauderdale. *Id.* at 45–46, 668 N.E.2d 1308. There, they purchased a kilogram of cocaine together. *Id.* at 46, 668 N.E.2d 1308. Rego drove that kilogram back to Massachusetts, and handed it over to Campiti in a parking lot near Agawam. *Id.*

Another co-conspirator, Joseph Labriola ("Labriola"), offered to testify against Campiti in order (as he admitted) to get out of prison. *Id.* at 70, 668 N.E.2d 1308. Labriola told the jury about three incriminating encounters with Campiti. *Id.* In the first encounter, he traveled to Florida with Campiti where Campiti purchased two kilograms of cocaine. *Id.* In the second encounter, Campiti had Labriola come to Springfield to help Campiti cut a kilogram of cocaine into saleable quantities. *Id.* Finally, Labriola testified that another co-conspirator, Sonny Pepe, smuggled a kilogram of cocaine out of one of Campiti's stash houses on the day the police executed a search warrant at that location. *Id.*

Campiti also faced damaging evidence from his own mouth. For example, in one tape recording of Campiti speaking to Rego in Campiti's car, Campiti told Rego that he had given out "nine" the previous day, which the prosecution suggested referred to nine ounces of cocaine. *Id.* at 47

---

**4.** As noted above, November 17, 1986 was the day the government executed its search warrants against Campiti and his co-conspirators.

n. 4, 668 N.E.2d 1308. In another recording, Campiti cautioned an associate who was about to get too explicit to "talk in riddles." *Id.* at 62, 668 N.E.2d 1308. The Appeals Court found as a matter of fact that "a frequent modus operandi of Campiti was to talk briefly to operatives and suppliers in a coded language, arrange to meet, usually within the hour, at a roadside location, then go for a short ride together in Campiti's rented (and frequently changed) car, during which time, it could reasonably be inferred, business was discussed." 41 Mass.App.Ct. at 62, 668 N.E.2d 1308.[5] The Appeals Court opinion excerpted one taped exchange as an example:

> Westerman: Yeah, I got a guy that's going to be calling me tomorrow (inaudible) I got, I just picked up a guy for four a week.
> Campiti: Man, don't talk too much. Do you, you want to see me. Do you want to see me or what.
> Westerman: Yeah, I got.
> Campiti: What time.
> Westerman: About 7:30.
> Campiti: What time is it now?
> Westerman: Alright the same spot.
> Westerman: Yeah . . .

*Id.* at 62 n. 21, 668 N.E.2d 1308.

Transcripts accompanied all the taped interceptions to assist the jury in following the recordings. Campiti moved, *in limine,* to have these transcripts excluded or, in the alternative, to have them formally reviewed so that any inaccuracies and quality problems could be corrected. (Docket 12, Exhibit 1 at 91–92).

The judge balked, stating that a jury had already been impaneled. *Id.* at 92. Reviewing the tapes one by one at that stage would be too time consuming. *Id.* at n. 29. The prosecutor also objected, and

stated that a review was not necessary since corrections had already been made during the Westerman trial, which had resulted in a conviction some five months earlier. *Id.* As a result of a similar motion by Westerman, the court had individually reviewed each of the tapes and transcripts, making corrections where necessary. *Id.* The prosecutor asserted that he had provided the court with approved transcripts made after Westerman's motion and, thus, they had already been "cleaned." *Id.* The judge denied the motion, and Campiti made no specific objection to the transcripts' accuracy during trial. (Docket 12, Exhibit 2 at 28).

The jury also received evidence in the form of testimony from members of the police investigating team. One testifying officer, John Mace ("Mace") is the primary subject of Campiti's collateral *Brady* claim, as discussed below. Mace's testimony, however, was peripheral. *See* 41 Mass. App.Ct. at 66, 668 N.E.2d 1308 (describing Mace as playing "a very minor role in the trial.").

The primary police testimony came from Trooper Higgins. The Appeals Court described him as "the principal investigator and the prosecution's principal police witness." 41 Mass.App.Ct. at 66, 668 N.E.2d 1308. Higgins testified about the police surveillance of Campiti and his associates and offered an interpretation of the coded language in the electronic surveillance tapes. *Id.* at 70, 668 N.E.2d 1308. A second officer, Trooper Sullivan, also played an important role in the trial (among others).

Campiti was convicted on March 3, 1989 on five counts of trafficking in cocaine. *Campiti v. Commonwealth,* 417 Mass. 454, 630 N.E.2d 596 (1994). He was sentenced

---

**5.** As noted, this finding must be assumed to be correct because Campiti has not attempted

to rebut it with "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1).

to five terms of ten to fifteen years in prison. Four terms were to be served consecutively, and one was to be served concurrently. 41 Mass.App.Ct. at 44, 668 N.E.2d 1308. Campiti appealed. An incredible seven and one-half years elapsed between the sentence and the eventual 1996 Massachusetts Appeals Court decision affirming his conviction.

Due to a more than two-year delay in producing the trial transcript, notice of completion of the record was not sent to the Appeals Court by the Superior Court clerk until August 30, 1991, roughly 29 months after the verdicts were entered. 417 Mass. 454, 630 N.E.2d 596. On April 4, 1992 (after the allowance of several extensions of time by the Appeals Court and a stay of all appellate proceedings), petitioner filed a motion for a new trial, a motion for reconsideration of his motion for required findings of not guilty, and a motion for discovery. *Id.* at 454–455, 630 N.E.2d 596. Within the next month, petitioner filed two more motions—one for expert witness fees and another for a new trial. *Id.* at 455, 630 N.E.2d 596. On November 6, 1992, the trial judge held a hearing on all the motions and took them all under advisement. *Id.*

On January 14, 1993, new defense counsel filed a petition with a single justice under Mass. Gen. Laws ch. 211 § 3 and § 4A for extraordinary relief due to the inordinate length of time which had passed without the Superior Court's ruling on the motions. *Id.* at 455, 630 N.E.2d 596. After oral argument, the justice denied Campiti's petition, and Campiti did not file an appeal to the full panel of the Supreme Judicial Court. *Id.* On April 5, 1993, the Superior Court issued a written memorandum denying Campiti's two motions for a new trial.[6] *Id.* On April 28, 1993, Campiti

appealed this decision to the Massachusetts Appeals Court, asking it to reverse the Superior Court's denial of all his motions. *Id.*

In addition, on April 20, 1993, Campiti filed a petition with the Supreme Judicial Court, asking it to invoke its "extraordinary powers" under Mass. Gen. Laws ch. 211, § 3 and § 4A in response to the inordinate delay in the appellate proceedings. *Id.* In essence, this petition claimed that "the commutative post-trial delays ... deprived [Campiti] of due process under the Fourteenth Amendment to the United States Constitution." *Id.* at 456, 630 N.E.2d 596. Further, he claimed that, absent relief under Mass. Gen. Laws ch. 211, § 3, he would suffer irremediable error under the ordinary review process. *Id.* After a hearing, a single justice of the Supreme Judicial Court denied this petition on July 2, 1993. Campiti appealed to the full court this time. *Id.* at 455, 630 N.E.2d 596.

The SJC denied his claim. First, the SJC noted "that the guarantee of a speedy trial set forth in the Sixth Amendment to the United States Constitution (and Art. 11 of the Massachusetts Declaration of Rights) is not read as applying to the appellate process." *Id.* Nevertheless, the Court did note that " 'deliberate blocking of appellate rights or inordinate and prejudicial delay ... may rise to the level of constitutional error.' " *Id., quoting Commonwealth v. Hudson,* 404 Mass. 282, 284, 535 N.E.2d 208 (1989). Although mindful of the "glacial pace" of the appellate process, the Supreme Judicial Court held that the Commonwealth did not deliberately block Campiti's appellate rights nor was Campiti significantly prejudiced by the delay. *Id.* at 456, 630 N.E.2d 596. As a

---

6. The record is not clear whether the state trial judge also denied his other motions (for expert witness fees, discovery, and for reconsideration of his motion for required findings). *See Campiti,* 417 Mass. at 454, 630 N.E.2d 596.

result, it found no violation of Campiti's due process rights. In so holding, it noted that, "[f]urthermore, the defendant may obtain review of his claims through the normal appellate process . . . ." *Id.* at 457, 630 N.E.2d 596. This decision was issued on April 8, 1994.

In the meantime, Campiti's direct appeal to the Massachusetts Appeals Court still was pending. Two years had passed and the Appeals Court had not issued a decision on Campiti's direct appeal or on the post-conviction motions. Once more, Campiti filed a collateral petition with the SJC asking it to invoke its "extraordinary powers." Again, he alleged that the inordinate length of time while the appeals were under advisement, combined with the delay that occurred while the case was pending in the trial court, constituted a violation of his due process rights. *See Campiti v. Commonwealth,* 426 Mass. 1004, 687 N.E.2d 268 (1997).

A single justice of the Supreme Judicial Court again initially denied Campiti's petition, but submitted the petition to the full court for consideration. A full panel of the Supreme Judicial Court affirmed the decision of the single justice and denied Campiti's petition. *Id.* Distinguishing the posttrial delay in the trial court from the appellate delay in his appeals, the court stated that "we had previously held that the posttrial delay in the trial court was not shown to be prejudicial and, in any case, could have been addressed and remedied, if warranted, through the normal appellate process." *Id.* at 1005, 687 N.E.2d 268; *citing Campiti v. Commonwealth,* 417 Mass. 454, 457, 630 N.E.2d 596 (1994). As a result, the court determined that the only question before the single justice was whether "Campiti had adequately demonstrated that the delay in his appeals had been inordinate and prejudicial." *Id.* at 1005, 687 N.E.2d 268.

The Court again affirmed the single justice's ruling and denied the petition, finding that although the appellate delay was inordinate, it was not shown to be prejudicial.

Campiti presented nothing to the single justice, either in his petition or at the hearing, demonstrating that the passage of this amount of time hindered his ability to present, or the court's ability to decide, the issues. Nor did he show that the delay in the Appeals Court following the oral argument somehow transformed what had previously been determined to be nonprejudicial delay in the trial court into prejudicial delay. Furthermore, we can safely say in hindsight that, because the Appeals Court upheld the convictions, there is no possibility that the delay impaired any retrial due to the unavailability of witnesses or the fading of memories, and Campiti did not even make such a claim before the single justice.

*Campiti v. Commonwealth,* 426 Mass. at 1005, 687 N.E.2d 268.

As the appellate process unfolded, the Commonwealth focused on a more unexpected defendant, former Chief Investigator Mace. About one year after Campiti's convictions, Mace was convicted of embezzling money from the District Attorney's Office to support his gambling habit. *Id.* at 65, 668 N.E.2d 1308. It emerged that Mace was stealing money from the District Attorney's Office during Campiti's investigation, and some of the money that he stole was cash seized from Campiti. 41 Mass.App.Ct. at 65 n. 23, 668 N.E.2d 1308.

Mace's criminal exploits were laid bare in frightening circumstances. One night, a young district attorney returned to the office to prepare for trial the next day. Entering the office, he interrupted Mace, who was proceeding to burn files in an attempt to conceal his corruption. Sur-

prised, Mace attacked the young interloper with a knife, who barely managed to trip a fire alarm and escape. *Id.* at 65, 668 N.E.2d 1308. The prosecution's failure to inform Campiti of Mace's corruption became a subject of Campiti's direct appeal and is raised here.

On August 7, 1996, the Appeals Court reached its decision, issuing a comprehensive thirty-page opinion affirming each of Campiti's convictions. 41 Mass.App.Ct. 43, 668 N.E.2d 1308 (1996). The Supreme Judicial Court denied further review in *Commonwealth v. Campiti,* 423 Mass. 1107, 671 N.E.2d 951 (1996), and in *Commonwealth v. Campiti* 423 Mass. 1111, 672 N.E.2d 539 (1996). Campiti filed a petition for a writ of *habeas corpus* on November 24, 1997. (Docket 1). That petition alleged that Campiti was imprisoned in violation of the Constitution and laws of the United States on thirteen grounds. *Id.*

The Commonwealth filed a motion to dismiss claims 2, 3, 4, 5, 6, 7, 9, 10, 11, and 13 of the petition, claiming that Campiti had failed to exhaust his state remedies with regard to those claims, or that they were barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). (Docket 10). On November 28, 1998, Magistrate Judge Neiman conducted oral arguments. He issued a Report and Recommendation on June 11, 1999, Docket 27, and on September 27, 1999, this court issued an order adopting the Report and Recommendation in part. (Docket 33). Campiti agreed that claims 5, 9, 10, and 11 had not been exhausted, and this court followed Judge Neiman's recommendation in dismissing them. This court adopted Judge Neiman's recommendation to allow the motion to dismiss claim 6, and to deny the motion to dismiss claims 1, 2, 3, 7, 8, 12, and 13. However, this court declined to adopt Judge Neiman's recommendation to deny the motion to dismiss claim 4, and

allowed the motion on the ground that claim 4 was barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). (Docket 33). Thus, Campiti's petition was found to contain both exhausted and unexhausted claims, and, therefore, to have been "mixed" under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

Accordingly, Campiti filed his amended petition on October 20, 1999. (Docket 35). On May 23, 2000, this court allowed Campiti's request to file a supplemental brief regarding prosecutorial misconduct. Campiti did so on August 15, 2000. (Docket 48). On September 4, 2001, Campiti filed a Second Supplemental Memorandum in support of his petition. (Docket 84). The Commonwealth filed its Second Supplemental Memorandum in Opposition on November 1, 2001.

### III. *STANDARD OF REVIEW*

■ The Antiterrorism and Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, places a number of procedural and substantive hurdles before a state prisoner petitioning a federal court for *habeas corpus* relief. Procedurally, § 2254(b)(1) provides that

> An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)(i) there is an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement ensures that state courts have

**40**

a full opportunity to consider federal law challenges to a state custodial judgment before this court entertains a collateral attack. *See Duncan v. Walker*, 533 U.S. 167, 178–179, 121 S.Ct. 2120, 2127–2128, 150 L.Ed.2d 251 (2001).

■ Exhaustion requires that a petitioner have "fairly presented to the state courts," *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), his constitutional claim "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir.1994). "[S]pecific constitutional language, constitutional citation, [or] appropriate federal precedent . . ." will satisfy this requirement. *Nadworny v. Fair*, 872 F.2d 1093, 1101 (1st Cir.1989). "[A] passing reference" to a constitutional issue, however, will not preserve it for *habeas* review. *Casella v. Clemons*, 207 F.3d 18, 21 (1st Cir.2000). " 'Above all else, the exhaustion requirement is to be applied with a view to substance rather than form: the claim need not be argued in detail nor separately presented, but its federal quality . . . must be readily apparent.' " *Id.*, *quoting Nadworny*, 872 F.2d at 1101.

■ Even if a claim has been exhausted, a federal court will refuse to hear the claim if the state court rested its decision on state substantive or procedural law. *Phoenix v. Matesanz*, 189 F.3d 20, 24 (1st Cir.1999). Thus, the petitioner must not only have raised the federal issue in the state courts but the state court must have based its decision, at least in part, on the federal claim. *Id.*

If a petitioner successfully leaps the procedural hurdles, he must then confront another set of strict requirements imposed under the AEDPA. The statute provides that:

(d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). The AEDPA's "new constraint," *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), on *habeas* review requires this court to focus on the state court's decision upholding petitioner's conviction; this court " 'asks whether the [state] court's application of the analytic framework dictated by the relevant Supreme Court precedents was objectively unreasonable' or contrary to that law." *Mountjoy v. Warden*, 245 F.3d 31, 35 (1st Cir.2001), *quoting Williams v. Matesanz*, 230 F.3d 421, 427–428 (1st Cir.2000).

■ The AEDPA's "contrary to" and "unreasonable application" clauses require two distinct analyses. *Mountjoy*, 245 F.3d at 35; *citing Taylor*, 529 U.S. at 405, 120 S.Ct. 1495; *O'Brien v. Dubois*, 145 F.3d 16, 24 (1st Cir.1998). First, a decision may be "contrary to" federal law as determined by the Supreme Court if the state court (1) applied a rule that contradicted governing Supreme Court precedent, *or* (2) confronted a set of facts that were materially indistinguishable from a decision of the Supreme Court but arrived at a different result. *Taylor*, 529 U.S. at 406, 120 S.Ct. 1495.

■ Second, a decision should be set aside as an "unreasonable application" of Supreme Court precedent if the state court (1) identified the correct governing legal rule but unreasonably applied it to

the facts, or (2) unreasonably extended a legal principle to a new context where it should not have been applied, or (3) unreasonably refused to apply a legal principle to a new context where it should have been applied. *See Mountjoy*, 245 F.3d at 35; *Taylor*, 529 U.S. at 408, 120 S.Ct. 1495.

It must be emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Taylor*, 529 U.S. at 410, 120 S.Ct. 1495 (emphasis in original). As a result, "a federal *habeas* court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495; *see also Mountjoy*, 245 F.3d at 35. As with the "contrary to" clause, the propriety of a state court decision is determined by federal law as articulated by the Supreme Court. Nonetheless, Courts of Appeals cases "provide significant insight into what constitutes reasonableness for a particular fact pattern." *Phoenix*, 233 F.3d at 83 n. 3.

■ The AEDPA does not apply if the federal claim was not "adjudicated on the merits in state court proceedings.'" *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001), *quoting* 28 U.S.C. § 2254(d). A court "can hardly defer to the state court on an issue that the state court did not address." *Id.* Accordingly, when a federal claim is properly presented to the state appellate court but not addressed by that court, the unreviewed federal claim must be considered *de novo* by the reviewing federal court. *Id.*

■ However, even in this circumstance, the federal court should not throw the AEDPA to the wind. Rather, the state court's "determination of a factual issue" must be "presumed to be correct" under 28 U.S.C. § 2254(e)(1). This provi-

sion applies to decisions by state courts under review, regardless of whether they considered the federal claim as such. As the First Circuit has noted,

> Whether or not the state court has decided the federal claim on the merits, any factual determinations that it makes—even if they relate solely to an independent state claim—remain entitled to the presumption set forth in 28 U.S.C. § 2254(e)(1) insofar as they may be useful in consideration of the federal claim.

*DiBenedetto v. Hall*, 272 F.3d 1, 7 n. 1 (1st Cir.2001).

## IV. DISCUSSION

Each of Campiti's claims will be addressed in turn below.

### A. Appellate Delay

As noted, an extraordinary seven and a half years passed between Campiti's conviction in 1989 and the 1996 Appeals Court decision affirming his conviction. *See Commonwealth v. Campiti*, 41 Mass.App. Ct. 43, 668 N.E.2d 1308 (1996). Campiti argues that this inordinate delay in the appellate process violated his rights under the Sixth and Fourteenth Amendments and entitles him to a writ of *habeas corpus*.

#### 1. Procedural Bar

■ The Commonwealth argues that Campiti's delay argument is barred by the independent and adequate state law doctrine. *See Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In so arguing, it points to the SJC's statement that petitioner's complaint "could have been addressed and remedied, if warranted, through the normal appellate process." 426 Mass. at 1005, 687 N.E.2d 268. *See* Docket 63 at 17. It is well-settled that a state procedural bar may constitute an independent and adequate state ground. *See Coleman v.*

*Thompson,* 501 U.S. 722, 729–730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Phoenix v. Matesanz,* 189 F.3d 20, 24 (1st Cir.1999) (independent and adequate state grounds exist where "the state court declined to hear the federal claims because the prisoner failed to meet a state procedural requirement.")(quotations and alterations omitted). However, that was not the case with the 1994 and 1997 SJC decisions.

First, only the 1994 SJC decision based its denial, even in part, on Campiti's failure to raise the delay in his direct appeal.[7] The pre–1994 delay is only a subset of the delay complained about in Campiti's *habeas* petition, which objects to all the appellate delay that occurred until the Appeals Court rendered its decision in 1996.

Second, both decisions relied in part on federal law. In 1994, the SJC recognized Campiti's objection as a claim under the Due Process Clause of the Fourteenth Amendment. *See* 417 Mass. at 456, 630 N.E.2d 596. It held, quite correctly, that no violation of due process under the federal constitution could have been caused by the delay if (1) the Commonwealth did not deliberately block Campiti's appellate rights, and (2) Campiti was not prejudiced by the delay. *Id.* The 1994 decision summarily dismissed the notion that the Commonwealth deliberately blocked Campiti's appellate rights, and found that Campiti was not prejudiced by the delay to that point. *Id.* at 456–457, 630 N.E.2d 596.

The 1997 decision considered whether the delay by the Appeals Court could have prejudiced Campiti, and found that there was "no possibility" that it did because the Appeals Court upheld the convictions. 426 Mass. at 1005, 687 N.E.2d 268. It rested its decision on federal grounds.[8] "In *habeas,* if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *See Coleman v. Thompson,* 501 U.S. at 735, 111 S.Ct. 2546. Therefore, Campiti may raise the appellate delay issue on *habeas* review.

### 2. *Analysis*

Although this court can hear his complaint that post-trial delay violated his right to due process, the claim must be denied under the AEDPA's strict substantive analysis. As noted, a federal court can only overturn a state court's decision if it determines that the state court's application of the analytic framework dictated by the relevant Supreme Court precedents was either objectively unreasonable or contrary to law. Here, Campiti fails on both prongs.

### a. *Contrary to Federal Law*

▮ Before engaging in the "contrary to" analysis, the *habeas* court must first ask whether the Supreme Court has prescribed a rule that governs the petitioner's claim or has decided a case with a set of facts that are materially indistinguishable from the present facts. In the absence of one of these circumstances, the "contrary

---

**7.** The 1997 decision, in the passage cited by the Commonwealth, was merely summarizing the 1994 decision: "We *had previously held* that the posttrial delay in the trial court was not shown to be prejudicial and, in any case, could have been addressed and remedied, if warranted, through the normal appellate process." 426 Mass. at 1005, 687 N.E.2d 268 (emphasis added).

**8.** Although the 1997 decision discussed "due process" without making clear that it was referring to the federal constitution, and did not cite any federal cases, it is clear that it was incorporating the 1994 discussion, which did explicitly discuss Campiti's federal claim. Thus, it is clear that the 1997 decision rested on federal grounds.

to" clause drops from the equation. Here, there is no governing rule from the Supreme Court regarding if, and when, appellate delay may constitute a due process violation. *See Simmons v. Beyer*, 44 F.3d 1160 (3d. Cir.1995) ("the Supreme Court has not explicitly recognized a criminal defendant's right to a speedy appeal."). The court has also found no. Supreme Court case with materially indistinguishable facts. As a result, the "contrary to" analysis ends here.

### b. *Unreasonable Application*

■ Although the Supreme Court has not addressed appellate delay in the due process context, seven of the Courts of Appeals have held that an appellate delay may constitute a due process violation under some circumstances. *See United States v. Luciano–Mosquera*, 63 F.3d 1142, 1158 (1st Cir.1995); *Simmons v. Beyer*, 44 F.3d 1160, 1169 (3rd Cir.1995); *U.S. v. Hawkins* 78 F.3d 348, 351 (8th Cir.1996); *United States v. Tucker*, 8 F.3d 673, 676 (9th Cir.1993) (en banc); *Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir.1994); *Cody v. Henderson*, 936 F.2d 715, 719 (2nd Cir.1991); *U.S. v. Bermea*, 30 F.3d 1539, 1568 (5th Cir.1994).

In the absence of federal law established by the Supreme Court, federal law interpreted by the Courts of Appeals will "provide significant insight into what constitutes reasonableness for a particular fact pattern." *Phoenix*, 233 F.3d at 83 n. 3. As a result, this court will review the reasonableness prong using the First Circuit's analysis of whether appellate delay amounted to a constitutional violation. *See Luciano–Mosquera*, 63 F.3d at 1158. In *Luciano–Mosquera* the First Circuit stated that,

mere delay, in and of itself will not give rise to a due process infraction. The defendant must show prejudice. Whether an appellate delay results in prejudice sufficient to warrant reversing a conviction rests, most importantly, on a showing that it has impaired the appeal or the defense in the event of retrial.

*Id.,citing Tucker*, 8 F.3d at 676–77.

Although the Supreme Judicial Court cited only state court opinions, it identified Campiti's federal claim, stated the correct governing legal rule under federal law,[9] and reasonably applied it to the facts of this case. In both the 1994 and the 1997 decisions, the Supreme Judicial Court held that the delay did not prejudice Campiti in any way. 426 Mass. at 1005, 687 N.E.2d 268 ("because the Appeals Court upheld the convictions, there is no possibility that the delay impaired any retrial due to the unavailability of witnesses or the fading of memories . . .").

The Supreme Judicial Court explicitly recognized that the delay in this case was "deplorable." 417 Mass. at 457, 630 N.E.2d 596. Nevertheless, it was undoubtedly correct when it found that Campiti had not shown that he was prejudiced by the delay, either in his ability to pursue his appeals or in his ability to retry the case. Therefore, the delay in this case cannot provide grounds for allowing Campiti's *habeas* petition.

### B. *Ineffective Assistance of Counsel*

Campiti next claims that his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution was violated, and that this entitles him to a writ of *habeas corpus*.

---

9. *See Campiti* 417 Mass. at 456, 630 N.E.2d 596 ("to implicate his due process rights, the defendant must show that the Commonwealth deliberately blocked his appellate rights or that he was significantly prejudiced by the delay"); *see also Campiti*, 426 Mass. at 1004, 687 N.E.2d 268 (same).

In a prior proceeding, this court adopted the Report and Recommendation of Magistrate Judge Neiman, which found that Campiti exhausted his claim of ineffective assistance of counsel only to the extent that this deficiency occurred prior to trial. (Docket 33 at 5). Any claim that his counsel was constitutionally defective during trial was found not to have been exhausted. *Id.* Therefore, the following analysis will be confined to the effectiveness of Campiti's counsel during the motion to suppress the electronic evidence; this is the *pretrial* conduct that Campiti complains about. *See* Docket 27 at 9–10.

According to Campiti, the trial court rendered Rubin constitutionally ineffective. He argues that the trial judge's refusal to grant a continuance and to consider Rubin's suppression motion independently deprived him of the effective assistance of counsel.

### 1. *Procedural Stance*

■ Ordinarily, a federal court exercising *habeas* review over a claim of ineffective assistance of counsel need only consider whether the state court's application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was objectively reasonable. *See Phoenix v. Matesanz*, 233 F.3d 77, 82–83 (1st Cir. 2000). If the state court determines in a "reasonable" fashion that (1) counsel's performance was not deficient *or* (2) the defi-

cient performance did not prejudice the defense, a writ of *habeas corpus* will not be allowed on the basis of ineffective assistance of counsel. *Id.* at 81–82. Accordingly, a writ of *habeas corpus* must be denied even if the state court upholds the petitioner's conviction by applying the *Strickland* test in a manner the *habeas* judge might disagree with, so long as the state court's analysis is reasonable. *Id.* at 81.

■ But this analysis does not apply when the state court decision does not cite *Strickland.* As noted, when a federal claim is properly presented for purposes of exhaustion, but not addressed by the state court, it must be considered *de novo* by the reviewing federal court. *Fortini*, 257 F.3d at 47 (1st Cir.2001). This court held in a prior proceeding that Campiti had exhausted his federal claim of ineffective assistance of counsel to the extent that this deficiency occurred prior to trial. (Docket 33 at 5). Campiti cited *Strickland* and several other federal cases in support of this claim in his state court brief, and thus clearly maintained that he was deprived of the effective assistance of counsel in violation of the federal constitution. (Docket 12, Tab 1 at 100–101). Yet the Massachusetts Appeals Court only addressed Campiti's claim under state law. 41 Mass.App. Ct. at 59–61, 668 N.E.2d 1308. Therefore, *Fortini* requires that this court apply the *Strickland* test *de novo* to Campiti's claim of ineffective assistance of counsel.[10]

---

**10.** It should be noted the failure of the Appeals Court to address the federal standard explicitly is probably academic in an ineffective assistance claim. As the First Circuit has noted, it is "exceedingly unlikely" a claim of ineffective assistance of counsel will be treated differently under the federal standard. *See Phoenix v. Matesanz*, 189 F.3d 20, 26 n. 4 (1st Cir.1999). This is because "[t]he SJC itself, while leaving open the theoretical possibility that there might be some difference between the state and federal standards, has concluded

that if their state's test is satisfied, 'the Federal test is necessarily met as well.'" *Scarpa v. DuBois*, 38 F.3d 1, 8 (1st Cir.1994), *quoting Commonwealth v. Fuller*, 394 Mass. 251, 475 N.E.2d 381, 385 n. 3 (1985). The Massachusetts standard is "functionally identical to the federal standard." 38 F.3d at 7 n. 4. Here, it makes no difference. As the following discussion will show, this court's *de novo* review reaches the same conclusions as the SJC's state law analysis.

## 2. *Strickland Analysis*

### a. *Performance*

██ The trial judge's denial of Rubin's request for a continuance did not render his performance deficient. As the Appeals Court pointed out, Rubin ended up with almost three and a half months to prepare for trial. 41 Mass.App.Ct. at 59, 668 N.E.2d 1308. This was more than adequate time, and the trial court's denial could not have rendered Rubin's performance deficient. The Supreme Court has held that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), *citing Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Thus, Rubin's performance was not constitutionally deficient.

██ Rubin's decision to file the same suppression motion as the lead counsel representing his co-defendants also did not render his performance constitutionally deficient. The Superior Court found as a matter of fact that the lead counsel on the suppression motion (which included Attorney Bongiorni, Campiti's present counsel) were "highly regarded and experienced" and represented all the defendants "with zeal and outstanding legal ability." 41 Mass.App.Ct. at 56, 668 N.E.2d 1308. It noted further that the hearing lasted four days, the parties' positions were briefed, witnesses testified, and the tapes themselves were examined. *Id.* These factual findings are entitled to deference under 28 U.S.C. § 2254(e)(1). *DiBenedetto,* 272 F.3d at 7 n. 1. Given these facts, there is little doubt that Campiti's federal constitutional right to counsel was satisfied, like that of all seventeen of his co-defendants, by the outstanding performance of the suppression motion's lead counsel. Thus,

Rubin's performance was constitutionally sufficient.

### b. *Prejudice*

██ Campiti also could not have been prejudiced by the fact that his counsel only had three and a half months to prepare, or by the fact that his counsel did not file an independent or different suppression motion. Under *Strickland,* a petitioner suffers no prejudice if there is not a reasonable probability that "but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. There was no reasonable probability that Rubin would have succeeded where the lead counsel for the other seventeen defendants failed.

This is true despite the fact that Campiti now argues that the lead counsel did not argue that the search warrant application was lacking in probable cause. *Id.* at 59–60, 668 N.E.2d 1308. It is true that the record did not reflect that this argument was made, but as the Appeals Court found with some digging, the trial judge's suppression decision actually found that "the balance of the lengthy warrant application did show probable cause for the issuance of the critical September 18 warrant." 41 Mass.App.Ct. at 60, 668 N.E.2d 1308. In any case, this and the other contentions that Campiti now claims that Rubin could have made do not resemble winning arguments, and therefore do not show that there was a reasonable probability that the electronic evidence would have been suppressed if Rubin had made a separate argument. Therefore, Campiti was not prejudiced by Rubin's performance. As a result, no writ of *habeas corpus* can issue on the basis of Campiti's ineffective assistance claims.

### c. *Right to Presence*

█ Campiti also contends that he was denied the effective assistance of counsel because he was denied his right to be present for the suppression hearing. The right to presence is distinct from the right to the effective assistance of counsel, although both fall under the rubric of the Sixth Amendment. *See U.S. v. Gagnon,* 470 U.S. 522, 525, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). Even if Campiti were not present for a crucial stage of the hearing, his absence would not support a claim for ineffective assistance of counsel unless his counsel somehow prevented him from being present. As the record makes clear, if Campiti was not present for any crucial proceeding, it was because he absconded to Florida. 41 Mass.App.Ct. at 43, 668 N.E.2d 1308. His flight cannot be laid at the doorstep of his counsel.

The fact is, in any event, that Campiti *was* present for *his* suppression motion. On February 22, 1989, the day of trial, Rubin moved to have the electronic evidence suppressed and the court denied the motion. *Id.* at 55, 668 N.E.2d 1308. As the Appeals Court found, "Campiti was present for this procedure; thus his right to be present at all stages of the proceedings against him was not violated." 41 Mass.App.Ct. 43, 57, 668 N.E.2d 1308. The fact that Campiti's counsel presented a motion that was identical to a motion that had already been rejected does not mean that Campiti's right to presence was infringed. In any case, the Appeals Court reasonably determined that the performance of Campiti's counsel was constitutionally adequate, and could not have prejudiced him. That determination ends the discussion.

### C. *Prosecutorial Misconduct*

Campiti next argues that several instances of prosecutorial misconduct support his application for a writ of *habeas corpus.* He claims that his right to due process was violated by the prosecution's (1) failure to disclose Mace's criminal acts; (2) misleading the trial court as to the transcripts of the taped intercepts; (3) failure to disclose an illegal physical entry; and (4) destruction of relevant evidence. (Docket 48).

### 1. *Exculpatory Evidence*

Campiti addresses the first two prosecutorial misconduct claims under the rubric of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Therefore, they will be discussed together.[11] The claim related to Mace is quite simple. According to Campiti, the prosecution violated its *Brady* duties when it failed to disclose Mace's ongoing criminal enterprise.

The claim related to the transcripts, however, is harder to make out. As noted above, Campiti moved, *in limine,* to have these transcripts excluded or, in the alternative, to have them formally reviewed so that any inaccuracies and quality problems could be corrected. (Docket 12, Exhibit 1 at 91–92). In response to this motion, the prosecutor stated that a review was unnecessary since corrections had already been made during the Westerman trial. *Id.* According to Campiti, the prosecutor's statement was misleading because only some of the transcripts that were at issue in his trial had been checked during the course of the Westerman trial. This,

---

**11.** The Commonwealth's arguments that these claims are procedurally barred are easily disposed of. It is clear that Campiti's *Brady* claim related to Mace's criminal history is not a "new claim." *See* Docket 35 at 6. Campiti's *Brady* claim relating to the transcripts may also be discussed on the merits; it was raised on direct appeal, *see* docket 12, exhibit 1 at 91–92, and is not otherwise barred.

Campiti argues, amounted to suppression of evidence.

A *Brady* analysis has three prongs. First, "the evidence at issue must be favorable to the accused." *Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Second, it "must have been suppressed by the state." *Id.* at 282, 119 S.Ct. 1936. Third, "prejudice must have ensued." *Id.* Campiti's claim regarding the transcripts does not satisfy even the first requirement.

Campiti claims that the prosecutor's remarks regarding the transcripts amounted to a *Brady* violation because they were the equivalent of knowing perjury under *Giglio v. United States,* 405 U.S. 150, 154–155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). According to Campiti, the prosecutor committed knowing perjury when he wrongly implied that the transcripts in this case were identical to the transcripts in the Westerman case. This perjury caused the judge to deny Campiti's request for a renewed accuracy hearing, and so violated his right to due process.

■■■ The Appeals Court did not reach this claim as such.[12] Thus, this *Brady* argument will be reviewed *de novo* under *Fortini v. Murphy,* 257 F.3d 39, 47 (1st Cir.2001), because it was a properly presented federal claim not reviewed by the state court. *See* Docket 12 at 87, 91. Even under *de novo* review, however, the prosecutor's remark is insufficient to support a *Brady* claim. As the Appeals Court pointed out, the transcripts were not introduced as *evidence.* 41 Mass.App.Ct. at 71, 668 N.E.2d 1308. Thus, the prosecutor's

comment, even if in error, could not have resulted in a violation of due process under *Brady.* A necessary condition of a *Brady* claim is that *evidence* was suppressed.

In *Giglio,* the defendant's due process rights were violated by the admission of false *testimony;* it was "the presentation of known false *evidence* [that was] incompatible with 'rudimentary demands of justice.' " 405 U.S. at 153, 92 S.Ct. 763, *quoting Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (emphasis added). In this case, the prosecutor's statement to the judge obviously was not evidence itself.

Moreover, the prosecutory's statement did not lead to the introduction of false evidence. Campiti did not then, and does not now, point to any specific inaccuracies in the transcripts. *Cf. United States v. Ademaj,* 170 F.3d 58, 65–66 (1st Cir.1999) (no abuse of discretion when defendant objected to use of transcripts, but made no specific objection as to accuracy and provided no alternative transcript) *cert. denied* 528 U.S. 887, 120 S.Ct. 206, 145 L.Ed.2d 173 (1999); *United States v. Young,* 105 F.3d 1, 10 (1st Cir.1997) ("Should a defendant fail to offer specific objections during playback of the tape, or offer an alternative transcript, the district court does not abuse its discretion by allowing the jury to use the transcript."). Thus, the prosecutor's statement regarding the transcripts cannot constitute a *Brady* violation. It was neither itself, nor led to the introduction of, false testimony. No further analysis is required. Thus, the three-pronged *Brady* analysis is conducted below for the suppression of Mace's criminal activity alone.

---

**12.** However, it did address Campiti's complaint about the transcripts as a facet of his ineffective assistance of counsel complaint. It found no fault with trial counsel, and held that "[m]oreover, it was the tapes, not the transcripts, that were put in evidence in this case (although the jurors were shown the transcripts as an aid in understanding the tapes), and the jurors could form their own judgments about their content in marginally audible portions." 41 Mass.App.Ct. at 71, 668 N.E.2d 1308.

### a. *Favorable To The Accused*

██ There is little question that evidence of Mace's nefarious activities would have been favorable to Campiti. Favorable evidence includes impeachment evidence as well as exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Mace testified for the prosecution and could have been impeached by evidence that he was stealing to support a gambling habit.

### b. *Suppressed by the State*

Whether the prosecution "suppressed" evidence of Mace's unlawful activity is a more difficult question. In the usual case, the prosecution is aware, or at least could have become aware through diligent efforts, of the impeachment evidence. *See United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir.1991) (prosecution witness history could have been found in Virgin Islands records). This is obviously not the case with evidence showing that a police officer was corrupt that was only discovered by prosecutors *after* the trial was over.

Indeed, the Appeals Court rejected Campiti's claim related to Mace's criminal activity on state grounds, in part because it held that the prosecution had no obligation to disclose Mace's unknown crimes. Citing *Commonwealth v. Waters*, 410 Mass. 224, 229, 571 N.E.2d 399 (1991), the Appeals Court held that even if Mace was a "member of the prosecution team," the prosecution's responsibilities did not extend to disclosing unlawful activity by a prosecution team member that was not in furtherance of law enforcement goals. 41 Mass.App.Ct. at 66, 668 N.E.2d 1308. The Appeals Court noted further that, "[a] general request for exculpatory evidence does not compel the prosecution to investigate the backgrounds of its witnesses." *Id.*

The Commonwealth argues that this holding is not contrary to or an unrea-sonable application of federal law, and therefore cannot support a writ of *habeas corpus* under 28 U.S.C. § 2254(d)(1). However, this court is required to review Campiti's *Brady* claim *de novo* under *Fortini*, 257 F.3d at 47, because, as noted above, the federal claim was raised but not addressed by the Appeals Court.

The Supreme Court case of *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), establishes the background rule. There, the Court held that impeachment evidence known only to the police was subject to *Brady* disclosure. 514 U.S. at 438, 115 S.Ct. 1555. As the Court put it,

> any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Id.* In other words, the police may not "help" the prosecution by keeping exculpatory evidence to themselves. *See U.S. v. Josleyn*, 206 F.3d 144, 154 (1st Cir.2000) ("prosecutors may be held accountable for information known to police investigators."); *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir.1979) (detective deliberately concealing witness). It is also clear that exculpatory evidence includes impeachment material about the criminal backgrounds of prosecution witnesses. *See Perdomo*, 929 F.2d at 970 (criminal history of key prosecution witnesses in Virgin Islands records was available to prosecution for *Brady* purposes). Mace, a police officer and member of the prosecuting team, had information about unlawful activity by a prosecution witness (himself) and did not turn it over. Thus, *Brady* and its progeny facially label this suppression a violation of due process.

Yet the Commonwealth argues that *Brady* should not apply in this sort of case. Indeed, it argues that *Teague v. Lane*, 489 U.S. 288, 307, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), which prohibits the application of "new rules" to cases arising on collateral review, prohibits this court from finding that the prosecution was required by *Brady* to turn over evidence of Mace's unlawful activity. Its arguments are not without foundation.

As the Commonwealth points out, every state and federal court to address the issue ultimately has absolved the prosecution of responsibility for failing to disclose the unknown, unrelated criminal activity of its corrupt officers. *See United States v. Rosner*, 516 F.2d 269 (2d Cir.1975) (holding that new trial was not warranted by police officer's perjurious failure to admit all of his wrongdoing); *Commonwealth v. Waters*, 410 Mass. 224, 229, 571 N.E.2d 399 (1991) ("we have never held or suggested that actions taken by such officers, not in furtherance of law enforcement but rather in pursuit of an unlawful scheme of their own, such as robbery or extortion, are attributable to the prosecution."). *People v. Vasquez*, 214 A.D.2d 93, 631 N.Y.S.2d 322 (1995); (citing cases, and noting that "corrupt officer is not acting as an 'arm of the prosecution' when he or she is concealing his or her own criminal activity, unrelated to the case against a particular defendant"); *People v. Johnson*, 226 A.D.2d 828, 641 N.Y.S.2d 148 (1996) ("A police officer's secret knowledge of his own prior illegal conduct in unrelated cases will not be imputed to the prosecution for *Brady* purposes where the People had no knowledge of the corrupt officer's 'bad acts' until after the defendant's trial.").

■ These cases highlight the problem faced by the Commonwealth, but they are not sufficient in themselves to support denial of the petition. As an initial matter, *Teague* simply does not apply. As noted, the Supreme Court's decision in *Kyles* made it unmistakably clear that impeachment evidence known only to the police was nevertheless subject to *Brady* disclosure. 514 U.S. at 437, 115 S.Ct. 1555. This decision was handed down April 19, 1995. 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490. The Appeals Court decision was issued August 7, 1996. 41 Mass.App. Ct. 43, 668 N.E.2d 1308. Thus, *Kyles* obviously did not establish a "new rule" of constitutional law for purposes of the Appeals Court decision.

Since *Kyles* established the applicable rule, the Commonwealth is hard-pressed to argue that it lacked responsibility for Mace's failure to disclose his unlawful activity. The cases with similar factual circumstances cited by the Commonwealth were decided before *Kyles*, with the exception of *Johnson*, which did not cite or distinguish *Kyles*.

■ Thus, the Commonwealth must argue, in effect, that this court should find an "unrelated criminal activity" exception to the general *Kyles* rule that knowledge of *Brady* evidence by members of the prosecution team is imputed to the prosecution. Under this proposed exception, the prosecution could not be held responsible for failing to disclose the unknown, unrelated criminal activity of members of its prosecution team that would be useful for purposes of impeachment. According to the Commonwealth, a police officer in these circumstances "cannot be said to be acting as an agent of the prosecution." (Docket 63 at 39).

This is a knotty issue the court need not address on the facts of this case. As will be seen below, even assuming a *Brady* violation occurred (which this court declines to decide), there was no prejudice justifying issuance of the writ. Only if there was "a reasonable probability that the suppressed evidence would have pro-

duced a different verdict," *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936, will *habeas* relief be justified. If the officer's corruption puts "the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555, the verdict should not stand. In addressing the propriety of issuing the writ, the court will assume, without deciding, that a *Brady* violation could be found on these facts.

### c. *Prejudice*

### i. *Governing Law*

 As noted, a writ of *habeas corpus* should issue only if there is a "reasonable probability" that evidence of Mace's unlawful activity "would have produced a different verdict." *See Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Obviously, if there is no reasonable probability that a different verdict would have resulted, no writ will issue on this ground.

The Supreme Court and the First Circuit have established some guideposts for this analysis. The initial inquiry here will focus on the importance of Mace's testimony to the prosecution's case. As the Supreme Court has noted, "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." *Kyles*, 514 U.S. 419, 445, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In this case, the court will assume that Mace's testimony would have been entirely discredited; the jury would have been unlikely to put much stock in the words of a corrupt officer. However, it should be noted that the First Circuit's "decisions have [not] been sympathetic to new trial claims based solely on the discovery of additional information useful for impeaching a government witness." *United States v. Sepulveda*, 15 F.3d 1216, 1220 n. 5 (1st Cir.1993).

A second step will look at the impact of the evidence on the testimony of other Government witnesses. As will be seen below, Campiti claims that Troopers Higgins and Sullivan had some knowledge of Mace's nefarious activities. The effect of this impeachment must, then, be considered as well.

The last step will consider the effect of the evidence on the case as a whole. As the Supreme Court has noted,

> [T]he material inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (citations omitted). Thus, in theory, the evidence of Mace's criminal activity might in some circumstances be enough to undermine confidence in the verdict, even though there was sufficient untainted evidence to convict Campiti.

On the other hand, in making this determination, it is important not to confuse a "reasonable probability" with a "reasonable possibility." As the *Strickler* court noted, Campiti's "burden is to establish a reasonable *probability* of a different result." 527 U.S. at 291, 119 S.Ct. 1936 (emphasis in original). Thus, the mere possibility that the jury would have acquitted Campiti after hearing the impeachment evidence will not be sufficient to support issuance of a writ of *habeas corpus*.

### ii. *Standard of Review*

As noted, a state court's factual determinations are entitled to the presumption set

forth in the AEDPA even if they relate only to its analysis of a state claim. 28 U.S.C. § 2254(e)(1). The Appeals Court's prejudice analysis was laced with factual determinations. Therefore, it will not be necessary for this court to reinvent the wheel, at least from the standpoint of finding facts relevant to the prejudice analysis.

### iii. *Analysis*

■ To determine whether the evidence of Mace's criminal activity would have "put the whole case in such a different light as to undermine confidence in the verdict," *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936, it is necessary to examine the evidence. As noted in the facts section above, the most damaging evidence came from the testimony of Campiti's suppliers. Rego testified about three trips to Florida during which Campiti bought large amounts of cocaine. 41 Mass.App.Ct. 43, 45, 668 N.E.2d 1308. Labriola also testified about three incriminating encounters with Campiti by describing Campiti as purchasing two kilograms of cocaine in Florida, cutting a kilogram of cocaine into saleable quantities in Springfield, and by testifying that a kilogram of cocaine was smuggled out of the stash house just before the warrant was executed. *Id.* Rego and Labriola's denunciations were bolstered by the electronic recordings of Campiti's own incriminating words.

Mace's testimony was strictly peripheral. The Appeals Court found that Mace played "a very minor role in the trial," *id.* at 66, 668 N.E.2d 1308, and Campiti concedes that "Mace's testimony arguably was not critical to the prosecution's case." (Docket 48 at 2). Campiti argues, however, that Troopers Higgins and Sullivan, the primary police witnesses, might have been impeached by the evidence of Mace's corruption as well.

Nevertheless, the prejudice argument is hard for Campiti to make. Unlike the *Kyles* petitioner, Campiti's own words back up the testimony of the prosecution witnesses. As the Appeals Court noted,

> Realistically, any hope the defendant might have had for acquittals dissolved when the judge allowed the use of the intercepted conversations. Any doubts that the jury might have had concerning the testimony of Rego and Labriola, whose motives and character were effectively impugned by Rubin, must have vanished when the tapes were played, confirming rather conclusively, by his own words, their testimony and the other evidence effectively marshaled by the Commonwealth.

41 Mass.App.Ct. at 72, 668 N.E.2d 1308.

There is no question that there was abundant evidence to convict Campiti even absent the testimony of Troopers Mace, Higgins, and Sullivan. As the Appeals Court noted, the testimony of his co-conspirators, supplemented by the electronic evidence, was more than sufficient to base a reasonable jury's conviction. *Id.* at 47, 668 N.E.2d 1308.

Thus, the only remaining question is whether the possibility of impeaching Higgins and Sullivan nevertheless would have "undermined" confidence in the verdict. What effect, for example, would the knowledge that Mace had stolen money from Campiti have had on the Troopers' credibility? According to Campiti, Mace stole $9,000 in cash from Campiti's wife on October 17, 1986, during the execution of a search warrant. On the same day, Troopers Higgins and Sullivan also seized over $1,200 in cash from Campiti and turned it over to Mace. Mace failed to account for these funds in the search warrant returns. *See* 41 Mass.App.Ct. at 65 n. 23, 668 N.E.2d 1308. Campiti suggests that he would have used this fact to impeach the testimony of Troopers Higgins and Sullivan. (Docket 48 at 2–3). Mace,

of course, would have been impeached by this evidence and all the other undisclosed evidence of his unlawful activity. For purposes of this analysis, it is assumed *arguendo* that with this evidence, Campiti could have made Mace look like a scoundrel and a liar, and could perhaps have convinced the jury that Troopers Higgins and Sullivan had at least "looked the other way" while Mace stole money from Campiti.

Even if the jury had interpreted this evidence as Campiti suggests, there is no probability, or even a significant possibility, that the verdict would have been different. For one thing, Campiti's accusation cuts both ways. By accusing Mace of theft, Campiti admits that he and his wife were in possession of over $10,000 in cash on November 17, 1986. This evidence suggests, at worst, that Campiti was a drug dealer robbed by a corrupt police officer. Indeed, Campiti admits that "the prosecutor referred to both seizures during the trial as well as introducing evidence of [Campiti's] lack of employment at the time of the seizures in an effort to portray him as a profiter from narcotics profiting before the jury." (Docket 48 at 3). The effectiveness of this argument would only have been enhanced by Campiti's charge (or admission) that he and his wife were robbed of over $10,000 in cash.

More fundamentally, the most relevant testimony submitted by the troopers was corroborated by the electronic evidence. *See* 41 Mass.App.Ct. at 72, 668 N.E.2d 1308. Even if the jury had come to believe that Higgins and Sullivan had somehow looked the other way while Mace stole, their testimony would not have been severely undermined. Each doubt that was raised about their testimony would have "vanished" when the tapes were played.

Like the testimony of Campiti's co-conspirators, the troopers would have been impeached perhaps, but then redeemed by corroborating electronic evidence. This fact, coupled with the sheer mass of evidence of Campiti's guilt, leaves no lack of confidence in the outcome of the trial. No writ can issue on this basis.

### 2. *Illegal Entry*

■ Campiti's next prosecutorial misconduct claim suggests that the prosecutors failed to disclose an illegal entry onto Campiti's property in order to install a wire tap. However, as the Commonwealth notes, this claim was not exhausted. (Docket 63 at 51). Although Campiti did argue on direct appeal that the wiretaps should be suppressed since the Commonwealth illegally entered his property, he did not argue that the prosecutors failed to disclose this information. (Docket 12, Exhibit 1 at 76). Because this particular prosecutorial misconduct argument was not raised in Campiti's direct appeal, it cannot be raised here.[13] *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 10, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

### 3. *Destruction of Evidence*

Campiti's last prosecutorial misconduct argument is that the Commonwealth failed to properly account for a number of records of incoming and outgoing calls, or "trap and trace" records. According to Campiti, these tapes were destroyed. (Docket 48 at 11).

This claim, again, is a suppression argument dressed up as a prosecutorial misconduct claim. On direct appeal, Campiti argued that the missing "trap and trace" records constituted a violation of state statutory law and that, as a result, the

---

**13.** To the extent that this claim is merely an alternate way of reasserting the fourth amendment claim, it may not be raised on collateral review. *See Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

evidence should have been suppressed. (Docket 12, Exhibit 1). Campiti did not fashion the claim, as he does here, as a *Brady* or a prosecutorial misconduct issue. As a result, this claim was not exhausted, and cannot be considered on collateral review. *See Tamayo–Reyes,* 504 U.S. at 10, 112 S.Ct. 1715.

## D. *Amendments to Indictment*

Campiti also argues that "he was tried for crimes for which he had not been charged, and convicted of crimes for which he was not on trial." (Docket 84 at 11). Before delving into the heart of this claim, a threshold analysis will address its proper scope and shape.

### 1. *Scope*

As noted, *habeas corpus* law limits Campiti to those arguments that were exhausted during his direct appeal. *See* 28 U.S.C. § 2254(b)(1)(A). Campiti's second supplemental brief to this court, which addresses the indictment and grand jury issue in part, is a virtual fountain of ideas. However, on direct appeal, Campiti's claim was more narrow. Arguing that state law rendered the amendment of his indictment unlawful, Campiti raised his federal claim in a footnote:

> The same result is required by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution which require the government to inform the accused "of the nature and cause of the accusation," and to try the accused on the charges that the Grand Jury voted and not on some other "charges that are not made in the indictment against him." *United States v. Santa–Manzano,* 842 F.2d 1, 2 (1st Cir.1988), quoting *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

Docket 12, Exhibit 1 at 123 n. 276. Only this general claim was exhausted and therefore only this argument can be entertained on the merits in this court. This segment of petitioner's argument breaks down into two sub-claims: (1) a notice claim under the Sixth Amendment; and (2) a grand jury claim under the Fifth Amendment.

 The latter claim, while exhausted, is without merit on its face. Although Campiti seems to suggest that the Grand Jury Clause has been made applicable to the states by the Fourteenth Amendment, the Supreme Court "has never held that federal concepts of a 'grand jury,' binding on the federal courts under the Fifth Amendment, are obligatory for the States." *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), *citing Hurtado v. California,* 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884). *See also Smith v. Hall,* 874 F.Supp. 441 (D.Mass.1995) (noting same), *aff'd without opinion* 62 F.3d 1411 (1995). Since he was indicted, tried, and convicted in state court, Campiti's arguments under the Grand Jury Clause of the Fifth Amendment must be rejected.

### 2. *Analysis*

This leaves Campiti with a "notice" claim under the Sixth Amendment. The basis for this claim was the amendment of the Commonwealth's indictment. As noted, the day after the trial started, the Commonwealth moved to replace the specific dates of the first three indictments with "on or before November 17th, 1986." *Id.,* Exhibit E. Campiti's trial attorney objected on the ground that "being less specific" made the Commonwealth's "burden a little bit less in proving the specific time." *Id.,* Exhibit F at 4. The Commonwealth responded by noting that "the date is not an element of the crime," and also pointed out that it had responded fully to a Bill of Particulars filed by Campiti some months earlier, outlining the expected testimony of Campiti's two co-defendants. *Id.* at 5. The

trial judge allowed the motion to amend. *Id.* at 9.

The Appeals Court rejected Campiti's objection to this decision, finding, *inter alia*, that the amendment as to the time of the offenses amounted to a "matter of detail" and, as a result, did not constitute error. 41 Mass.App.Ct. at 50, 668 N.E.2d 1308. However, the Appeals Court considered the issue on state law grounds only. Therefore, as noted, this court is required to consider the issue *de novo*. *See Fortini*, 257 F.3d at 47.

There is no question that the Sixth Amendment required the Government to inform Campiti "of the nature and cause of the accusation[s] ...." *United States v. Santa–Manzano*, 842 F.2d 1, 2 (1st Cir. 1988) (quotations omitted). Campiti does not complain that the original indictment failed to give him "fair notice of the charges in order to be able to prepare a complete defense." *United States v. Allard*, 864 F.2d 248, 250 (1st Cir.1989). Thus, the question here is whether the Government's *amendment* of the indictment deprived Campiti of his right to constitutionally adequate notice. It did not.

 Campiti clearly had sufficient notice of the charges against him for Sixth Amendment purposes. Indeed, most of Campiti's arguments focus on the Grand Jury Clause, and once this prop is removed, the Sixth Amendment argument quickly topples over. The amendments moved the indictments from the more specific to the more general, but the conduct underlying the charges did not change. Rather than rendering the charges unconstitutionally vague, the amendments, as Campiti's trial counsel put it, at most made the Commonwealth's "burden a little bit less."

At no time was Campiti deprived of "all of the information and facts needed to inform [him] of the nature of the crime [that would] allow him ... an opportunity to prepare a defense to the allegations." *United States v. Butt*, 745 F.Supp. 34, 37 (D.Mass.1990). *See also United States v. Jaswal*, 47 F.3d 539, 543 (2d Cir.1995)("Insertion of the year into the jury instructions by the trial judge did not constructively amend the indictment."). As the Appeals Court found, the testimony of Campiti's co-defendants, Rego and Labriola, formed the basis for the indictments, and Campiti was not caught by surprise by either's testimony. 41 Mass.App.Ct. at 45, 50–51, 668 N.E.2d 1308. Both testified at the grand jury proceeding, *id.* at 51, 668 N.E.2d 1308, and the impending testimony of both co-defendants was forecast in the prosecution's Answer to the Bill of Particulars, which itself referred to conduct "on or before November 17, 1986." (Docket 85, Exhibit C). The Sixth Amendment was not offended by this notice.

### E. *Insufficiency of Evidence*

As a final matter, Campiti argues that a writ of *habeas corpus* must issue because the prosecution presented insufficient evidence to convict him. In his memoranda, Campiti argues that several facets of the jury's findings were not supported by sufficient evidence. However, only two of these claims were made on direct appeal and exhausted.

In his brief to the Massachusetts Appeals Court, Campiti claimed that there was insufficient evidence to support a finding that (1) he "possessed" the narcotics found in Westerman's apartment; and (2) he brought the drugs into the Commonwealth, and so "trafficked" in narcotics. (Docket 12, Exhibit 1 at 105–109). Although Campiti primarily cited state cases to support these claims, the final paragraph of that section cited the Fourteenth Amendment. *Id.* at 109. Thus, these claims will be considered exhausted. Campiti's other sufficiency claims, includ-

ing those related to the amendment of the indictment, discussed in his Second Supplemental Brief, docket 84 at 28, were not fairly presented on direct appeal, and will not be considered here. *See Scarpa v. DuBois,* 38 F.3d 1, 6 (1st Cir.1994) (discussing exhaustion requirement).

In review of these two claims, the legal standard will be applied *de novo,* but the Appeals Court's findings of fact will be given deference. *See* 28 U.S.C. § 2254. The federal test for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also Hurtado v. Tucker,* 245 F.3d 7, 18 (1st Cir.2001) (noting that "claims that the evidence was insufficient to support the verdict are often made, but rarely successful.") (quotation omitted), *cert. denied* — U.S. ——, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001).

This test obviously was met here. As was discussed in more detail above, the prosecution presented evidence from two of Campiti's co-conspirators, who described drug transactions with Campiti in sufficient detail to allow the jury to find that Campiti constructively possessed the cocaine at the Westerman house, and that he trafficked in cocaine. Rego testified about Campiti's relations with Westerman and both Rego and Labriola put forward evidence that would have allowed the jury to have reasonably found that Campiti trafficked in narcotics in the Commonwealth. It is clear, as the Appeals Court found, that "on the basis of their testimony alone, the Commonwealth satisfied its burden." 41 Mass.App.Ct. at 45, 668 N.E.2d 1308. In addition, Campiti faced evidence, *inter alia,* from Troopers Higgins, Sullivan, and Mace. All this was "con-firm[ed] rather conclusively, by [Campiti's] own words," as the Appeals Court found. *Id.* at 72, 668 N.E.2d 1308. As Campiti admits, the electronic recordings from Campiti's car "led to a series of directly incriminating conversations being intercepted between Petitioner and two confederates, Joseph Rego and Gary Westerman." (Docket 84 at 2). Put simply, "Campiti was done in ... by the testimony of his associates and, in the end, himself." 41 Mass.App.Ct. at 72, 668 N.E.2d 1308. This evidence was more than enough to satisfy the Fourteenth Amendment.

## V. CONCLUSION

For the reasons set forth above, Petitioner's motion for a writ of *habeas corpus* is hereby DENIED.

A separate order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, Petitioner's request for a writ of *habeas corpus* is DENIED. The clerk will enter judgment for the Respondent.